61 A.3d 104

**Jamaal Garvin ALEXIS**

v.

**STATE of Maryland.**

Nos. 2786, 2787, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Feb. 27, 2013.

**632**

Deborah S. Richardson (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Gary E. O'Connor (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: WATTS, BERGER, PAUL E. ALPERT (Retired, Specially Assigned), JJ.

WATTS, J.

Following a trial of consolidated cases from October 4, 2010, to October 29, 2010, a jury in the Circuit Court for Prince George's County convicted Jamaal Garvin Alexis, appellant, in case number CT08–0504X, of second-degree murder and robbery with a dangerous weapon of Raymond Brown, use of a handgun in the commission of a crime of violence, common law conspiracy to commit theft over $500, and two counts of theft over $500.[1] *See* Md.Code Ann., Crim. Law Art. ("C.L.") § 2–204 (second-degree murder); C.L. § 3–403 (robbery with a

---

1. The jury acquitted appellant of one count of first-degree murder of Raymond Brown, one count of first-degree felony murder of Raymond Brown, one count of carjacking of Raymond Brown, and one count of armed carjacking of Raymond Brown.

dangerous weapon); C.L. § 4–204(use of a handgun in the commission of a crime of violence); C.L. § 7–104 (theft). In case number CT09–1040B, the jury convicted appellant of solicitation to commit the murder of Bobby Ennels to prevent him from testifying in case number CT08–0504X, and solicitation to commit the murder of Bobby Ennels in retaliation for testifying before the grand jury.[2] *See* C.L. § 9–302(b)(2)(ii) (solicitation to induce a witness to be absent from an official proceeding to which the witness has been subpoenaed or summoned); C.L. § 9–303(b)(1) (solicitation with the intent of retaliating against a witness for giving testimony in an official proceeding).

On December 14, 2010, the circuit court sentenced appellant to a total of one hundred forty years' incarceration, as follows: As to case CT08–0504X, thirty years' incarceration for second-degree murder; twenty years' incarceration for use of a handgun in the commission of a crime of violence, the first five years to be served without the possibility of parole; twenty years' incarceration for robbery with a dangerous weapon; fifteen years' incarceration for conspiracy to commit theft over $500; fifteen years' incarceration for one count of theft over $500 and fifteen years' incarceration for another count of theft over $500;[3] and, as to Case No. CT09–1040B, twenty years' incarceration for solicitation to commit murder to prevent a witness from testifying and twenty years' incarceration for solicitation to commit murder in retaliation against a witness for testifying before the grand jury.[4]

Appellant noted an appeal raising four issues, which we quote:

---

**2.** The jury acquitted appellant of one count of conspiracy to murder Bobby Ennels, one count of obstructing justice by preventing testimony of Bobby Ennels, and one count of obstructing justice by retaliating against Bobby Ennels.

**3.** One count of theft over $500 merged with robbery with a dangerous weapon for sentencing purposes.

**4.** All sentences were imposed consecutively.

I. Did the [circuit] court err in disqualifying [a]ppellant's attorney, who had previously represented a State's witness, when [a]ppellant's counsel had arranged for co-counsel to cross-examine the witness?

II. Did the [circuit] court err in allowing the State to introduce Amadu Jalloh's prior testimony when the witness refused to testify at trial?

III. Did the [circuit] court err in admitting Bobby Ennels'[s] grand jury testimony on the ground that [a]ppellant procured his unavailability at trial?

III. Did the [circuit] court err by sentencing [a]ppellant on two counts of solicitation although there was but one incitement?

For the reasons set forth below, we answer each question in the negative. We shall, therefore, affirm the judgments of conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

The acts for which appellant was convicted concerning the murder of Raymond Brown occurred on October 13, 2006, outside of a residence on Stillwater Place in Prince George's County. The acts concerning the murder of Bobby Ennels occurred on October 7, 2008, on Nalley Road, in Prince George's County.

### Motion to Strike Appearance of Defense Counsel

After his indictment, appellant's trial was scheduled to begin on April 13, 2009. On April 1, 2009, the State filed a Motion to Strike Appearance of Defense Counsel (the "Motion to Strike") and an accompanying memorandum of law. In the Motion to Strike, the State contended that appellant's counsel, Harry Tun, Esq., had a conflict of interest under the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") because he had previously represented a State's witness, Amadu Sulamon Jalloh *aka* Kamara Mohamed ("Jalloh"), in a separate criminal case. The State argued that Tun was in possession of confidential information regarding Jalloh as a

result of the prior representation. Jalloh became a witness for the State, in appellant's case, when he contacted the State and advised that, while they were incarcerated together, appellant confessed to him that he had murdered Brown. In an affidavit accompanying the Motion to Strike, Jalloh attested that he had not waived the attorney-client privilege with Tun, and that he had filed a complaint against Tun with the Attorney Grievance Commission.

On April 9, 2009, appellant filed a Memorandum of Law in opposition to the State's Motion to Strike, advising that Tun represented Jalloh for a "brief and limited period of time" in a separate criminal case. Appellant advised, that: (1) on December 18, 2007, Tun filed a motion for release on bond on Jalloh's behalf and requested discovery, (2) on January 25, 2008, Tun filed a motion to sever charges in Jalloh's matter, and (3) on February 5, 2008, Tun withdrew as counsel for Jalloh. Appellant argued that, if there were a potential conflict of interest, Tun could create a "Chinese wall" to screen himself from the conflict by not using any confidences that he may have obtained from Jalloh in representation of appellant, and by having an attorney not affiliated with his firm (Hecht) cross-examine Jalloh at trial. Appellant asserted that Jalloh had waived the attorney-client privilege by filing a complaint with the Attorney Grievance Commission against Tun, and disclosing "the details of his case in an effort to express his dissatisfaction[.]"

On April 10, 2009, the circuit court conducted a hearing on the Motion to Strike. At the hearing, the State contended that Tun's representation of appellant violated: (1) MLRPC Rule 1.7, which provides that "a lawyer shall not represent a client if the representation involves a conflict of interest"; (2) MLRPC Rule 1.8(b), titled "Conflict of Interest: Current Clients: Specific Rules"; and (3) MLRPC Rule 1.9, titled "Duties to Former Clients." The State asserted that Tun's offer to build a "Chinese wall" violated his duty of loyalty to a former client. The State argued that there was a "relationship" between Tun and Hecht, the attorney Tun argued he

could use to cross-examine Jalloh, that "make[s] them similar to partners in a law firm."

On behalf of appellant, Tun contended that he and Hecht "[were] not in the same firm[,]" did not have keys to each other's offices, and were not the equivalent of partners in a law firm. Tun argued that a "Chinese wall" would be effective because Hecht did not have access to his files. Tun asserted that, by filing a complaint against him with the Grievance Committee, Jalloh had waived any privilege. Tun maintained that appellant had knowledge of the alleged conflict and was "willing to waive that conflict on his part so that he can have [the] attorney of his choice."

At the conclusion of the hearing, ruling from the bench, the circuit court granted the motion, stating as follows:

THE COURT: All right. On the State's motion to strike [ ] Tun as attorney for [appellant], for some reason, I don't know what the statistical likelihood of this happening is, the [appellant] in this case and [ ] Tun's former client, [ ] Jalloh, were placed in the same jail cell [at] the County Correctional Center and apparently have some conversations which I believe the State intends to use, if I'm not mistaken.

[PROSECUTOR ENGEL]: Yes, Your Honor.

THE COURT: While [appellant] has waived whatever conflict [ ] Tun might have, [ ] Amadu ... Jalloh—thank you— has not and, in fact, takes significant exception to [ ] Tun continuing to participate in this case when he, in fact, is going to be a witness for the State. The conflict is a significant one and I think we all agree there is, in fact, conflict. There is conflict with the duty of loyalty. I appreciate [ ] Tun represented him for a short period of time but, I think, that duty of loyalty continues and, in fact, there [ ] really is truly a conflict were this case to go to trial with [ ] Tun at the table.

To say that we can create a Chinese wall, a masonry wall, a brick or a block wall that solves this problem I think is folly. I just don't believe that we can do that. Having said

all that, accordingly, I'm going to direct the Clerk to strike [ ] Tun's appearance.

## Motion to Admit the Testimony of Bobby Ennels

On April 8, 2009, the State filed a "Motion to Admit Testimony Under Maryland Rule of Evidence 5–804(a) and Courts and Judicial Proceedings Article [ ("C.J.P.") ] § 10–901" (the "Motion to Admit Testimony"), requesting that the circuit court allow Ennels's grand jury testimony to be admitted at trial. The State contended that appellant "engaged in, directed or conspired with Rashadd Alexis, his brother[,] and others known to the State, to murder Bobby Ennels so that he could not testify against him at trial."

On August 4, 2009, and August 5, 2009, the circuit court held a hearing on the Motion to Admit Testimony.[5] After hearing testimony and the argument of counsel, ruling from the bench, the circuit court granted the State's Motion to Admit Testimony, finding as follows:

> In weighing all of the pluses and the minuses and the great deal of testimony and the evidence that we have heard, it would be difficult to have to overlook the obvious of what transpired in this case. So we're going to make the finding, by a clear and convincing evidence standard, that, in fact, State's Exhibit 47 should, in fact, be allowed for use at the trial, the first trial that [appellant] faces with regard to the murder of [Raymond Brown].
>
> It would appear from the facts in this case that this was a cold, calculated attempt to silence a witness in a murder

---

**5.** At the hearing, the State presented testimony from the following witnesses: Jalloh; James Zafiropulos, Esq. (Jalloh's attorney); Nieman Marcus Edmonds; Frances Lammons; Officers Juan Nolasco and Donovan Dearing and Detectives Robert Turner and Sean Chaney of the Prince George's County Police Department; Officer Tracey Burnett of the Seat Pleasant Police Department; Jessica Charak, a forensic chemist and DNA analyst with the Prince George's County Police Department Serology/DNA Laboratory; and Tina Perruzzi, an evidence technician with the Prince George's County Criminal Investigation Division, Forensic Services. Appellant presented testimony from Detective Patrick Turri of the Prince George's County Police Department.

case, that resulted not only in the murder of the witness, that is, Bobby Ennels, but also in the murder of [ ] Anthony Cash, III, and the wounding of Frances Lammons, however sad that might be.

## Trial

At trial, as a witness for the State, Danielle Steele Brown, the wife of the deceased, Raymond Brown, testified that in October 2006 she was living on Stillwater Place in Prince George's County with her husband. On the morning of October 13, 2006, at approximately 2:20 a.m., the Browns were awakened by the sound of Mr. Brown's car alarm. From a window, Mrs. Brown saw a tow truck towing Mr. Brown's car away. The Browns got into Mrs. Brown's car and drove to the entrance of the housing community to locate a sign containing the name of the towing company for the property. When the Browns reached the entrance to the community, the tow truck was there with Mr. Brown's vehicle attached to it. Mr. Brown got out of his car and approached a man who was standing outside of the tow truck. Mrs. Brown testified that, as Mr. Brown approached, the man began to run and gunfire came from the driver's side of the tow truck. After the gunfire, Mrs. Brown ran to Mr. Brown who was lying injured on the ground. The tow truck drove away with Mr. Brown's car still attached to it. Another car that was parked on the other side of the parking lot also departed. Mrs. Brown called 911 and paramedics arrived within minutes. Mr. Brown was transported to Prince George's Hospital Center, and died as a result of a gunshot wound to the chest.

Approximately six months after the shooting, detectives from the Prince George's County Police Department showed Mrs. Brown a photographic array. Mrs. Brown identified Edmonds as the man she saw standing next to the tow truck, who was not the shooter. Mrs. Brown told detectives that Mr. Brown's car was a black Chrysler 300 and that when she retrieved the car from the police impound lot, the wheels were missing.

The State requested and was granted permission to read the transcript of Ennels's grand jury testimony of March 6, 2008, to the jury over the defense's objection. Before the grand jury, Ennels testified that: On October 13, 2006, he was with a friend, Edmonds, when they encountered appellant, who was driving a black tow truck with a black Chrysler attached to the back of it. The driver's side window of the tow truck was shattered. Edmonds asked appellant what happened to the driver's side window of the tow truck. Appellant advised Edmonds that "the guy reached" and he (appellant) shot through the window. According to Ennels, appellant said he did not know if the shot hit "the guy" because he pulled off in the tow truck. On October 14, 2008, Ennels overheard a conversation between appellant and Brian Barnes, in which Barnes told appellant that he knew appellant shot and killed someone the night before. Appellant told Ennels that he shot "the guy" but he did not know whether he had killed him. Appellant said that he was going to dispose of the "rims" from the vehicle and the weapon.

As a witness for the State, Matthew Coppedge testified that he had known appellant since 2002, and that, a few times, he and appellant stole "[r]ims" together using a Snatchman tow truck. According to Coppedge, with a Snatchman tow truck, a car can be towed without the driver getting out to chain the car to the truck. Coppedge testified that he heard of the death of "Scotty Beats" [6] and telephoned appellant to ask "what he did." Later the same day, Coppedge met appellant in their neighborhood. During this meeting, appellant told Coppedge that he and Edmonds had been stealing a car in Largo and Ennels was acting as the look out. Appellant told Coppedge that while they were stealing the car "somebody came out and [ ] was about to do something to [Edmonds]" so he (appellant) reacted. Coppedge testified that appellant said that he shot a man through the glass of the driver's side window of the tow truck. Appellant said that he and Ed-

---

6. Brown was also known as "Scotty Beats."

monds took the wheels off the vehicle and sold them for a thousand dollars.

As a witness for the State, Barnes testified that he had known appellant since high school and lived several houses away from appellant. According to Barnes, he and appellant had a history of stealing cars together. Barnes testified that, in October 2006, he showed appellant the location of a Ford Snatchman tow truck. On the night of October 12, 2006, at approximately midnight, Barnes spoke to appellant to "get" a car for him. Appellant responded that he was busy and would call Barnes back later, but appellant failed to return Barnes's call. On October 13, 2006, Barnes heard that Brown had been killed and that the killing involved a tow truck. At approximately 3:00 p.m., Barnes spoke with appellant and asked whether he killed Brown. Barnes testified that appellant told him that he had to kill Brown because "[t]he dude was going to kill [Edmonds]." Appellant explained that Edmonds was strapping Brown's car to the tow truck and he (appellant) was attempting to protect Edmonds because the man was going to kill Edmonds. Barnes testified that he had known appellant to carry various types of guns and that appellant's .40 caliber handgun was missing after Brown's murder.

On October 13, 2006, law enforcement officers recovered a stolen Snatchman tow truck that had been abandoned in an industrial area. The ignition of the tow truck was damaged and there was a cartridge casing found inside the cabin of the truck.

On the same day, October 13, 2006, law enforcement officers recovered the Browns' Chrysler 300 vehicle that had also been abandoned. The vehicle had no tires, the driver's side door window was broken, and there was debris, including lug nuts on the ground around the car. As a witness for the State, Elores Clark, a fingerprint analyst of the Prince George's County Police Department, identified a latent fingerprint lifted from the hood of the vehicle as that of Edmonds.

As a witness for the State, Edmonds testified that he stole cars with appellant and Ennels. Edmonds testified that, on

October 12, 2006, he, Ennels, and appellant went to Fairmount Heights to meet Ronnell Davis, Darnell Davis, Cortez Mallory, and Darrell, whose last name Edmonds did not know, people with whom they "hung out" and stole cars. After meeting, the group went with Darnell in a tow truck and stole a vehicle in Oxon Hill. In the process of stripping the stolen vehicle, they discovered that they could not find the wheel locks, *i.e.* they could not get the wheels off. As a result, Ronnell, Darnell, Darrell, and Mallory left.

Appellant, Edmonds, and Ennels drove to Largo, with appellant driving the tow truck and Edmonds traveling in the backseat of Ennels's vehicle while Ennels drove. Edmonds testified that he fell asleep during the drive and "the next thing [he] kn[e]w" Ennels awakened him. He got out of the car and walked up to a Chrysler 300 vehicle which was already attached to the back of the tow truck. According to Edmonds, he went under the hood and disabled the alarm. Edmonds testified that he was not wearing gloves but that appellant and Ennels were.

According to Edmonds, a white Maxima vehicle approached them. As the vehicle came closer, Edmonds ran to Ennels's car and, as he did, he heard a "slight pow" and glass breaking. Ennels and Edmonds drove to a location off of Walker Road where they met appellant in the tow truck. Edmonds testified that he noticed the tow truck's window was broken, which it had not been previously. Edmonds asked appellant whether the man in the white Maxima shot at them, and appellant did not respond. Edmonds, appellant, and Ennels dropped the "rims" off at appellant's house and left the tow truck two streets away after wiping it clean of fingerprints.

Edmonds testified that the next day he had a conversation with appellant at Barnes's house. Appellant said that he shot Brown because he saw him (Brown) get out of the car with something in his hand. Edmonds testified that Ennels was present during this conversation and "freaked out." Edmonds testified that appellant asked him if he thought Ennels might "snitch[,]" and he told appellant that he did not think so.

Edmonds testified that approximately one month after the conversation at Barnes's house, appellant asked him "do [you] think [I] should kill [Ennels] if [Ennels] tried to snitch." According to Edmonds, he again responded that he did not think that Ennels would "snitch." Edmonds testified that appellant nonetheless suggested that Edmonds take Ennels to a night club, get him drunk, pull up to a stop light, and he (appellant) would do the rest. Edmonds testified that he told appellant he would not do that.

Edmonds testified that, in March 2007, he sold a burgundy Oldsmobile Aurora to Rashadd Alexis, appellant's brother. According to Edmonds, Rashadd owned the vehicle for a "[c]ouple months[,]" after which Edmonds purchased the car back from Rashadd.

As a witness for the State, Lammons testified that, on October 6, 2008, she spoke on the telephone with Ennels, whom she described as a friend. On the same day, Ennels and Anthony Cash picked Lammons up from her house and drove to Nalley Road. Upon arriving at Nalley Road, Ennels made a telephone call and said to the recipient of the call, "You all can come on down[.]" After approximately two minutes, two men approached the car and shot Ennels. Lammons testified that, before being shot, Ennels said, "You all don't have to worry about nothing[;] It's okay. It's cool." After being shot, Ennels put the car into reverse and crashed into a tree. Lammons and Cash got out of the car and ran. Lammons was shot in the elbow while running away. Ennels was found dead in the driver's seat of the car. Cash was found in the driveway of a home at 406 Nalley Road. Cash died as a result of gunshot wounds to the back, forearm, and knee.

A black skull cap found in the backyard of 404 Nalley Road contained a mixed DNA profile, to which Rashadd was determined to be the major contributor. Law enforcement officers determined that the last telephone number that called Ennel's cellular telephone was (202) 421–5787. This telephone number was associated with a prepaid telephone that was purchased at

Electroworld in Landover. According to Detective Turner of the Prince George's County Police Department, thirteen telephone calls were made from (202) 421–5787 to Ennels's cellular telephone between September 23, 2008, and October 7, 2008, the day of Ennels's murder. The telephone calls utilized cellular telephone towers near Swan Terrace. Detective Turner testified that a cousin and aunt of the Alexis family lived on Swan Terrace and that Rashadd's girlfriend lived a half mile from Swan Terrace.

Lammons testified that one of the two men who came to the car was "brown skin[ned with a] short haircut[ and t]he second was [ ] brown skin[ned] with dreads." According to Lammons, the man with the short haircut had the gun. While Lammons was in the hospital, detectives of the Prince George's County Police Department showed her a photographic array, and Lammons selected a picture of Barnes as someone who looked familiar to her.

Officer Nolasco of the Prince George's County Police Department testified that on October 7, 2008, at about 1:00 a.m., he observed two vehicles speeding from the area of Nalley Road and Twining Court on Hill Oaks Road. Officer Nolasco stopped one of the vehicles. According to Officer Nolasco, the driver of the vehicle he stopped was Rashadd. Officer Nolasco testified that Rashadd was extremely nervous and appeared to have blood on his shirt. Officer Turri of the Prince George's County Police Department testified that, although Officer Nolasco stopped Rashadd not far from the location in which Ennels and Cash had been murdered, a detective at the scene of the shooting ordered that Rashadd be released. The car driven by Rashadd, a Buick Regal, was registered to Deaundrey Shropshire.

The State introduced audiotapes of telephone calls made by appellant while detained at the Prince George's County Detention Center. An audiotape of a telephone call that occurred on October 3, 2008, between appellant and Shropshire was introduced into evidence as State's Exhibit 100. In the conversation, appellant asked, "What is going on with my M?" and

Shropshire responded, "You still haven't told me what you want me to do with that [guy]."

## Jalloh's Refusal to Testify

Jalloh testified as a witness for the State at the hearing on the Motion to Admit Testimony, but refused to testify for the State at trial. At trial, when Jalloh was called to testify, the following colloquy occurred outside of the presence of the jury:

[PROSECUTOR]: Sir, my question is, are you prepared to offer testimony in this trial today?

[JALLOH]: No.

[PROSECUTOR]: And if I asked you any question regarding the substance of any information you have about this case, will you answer them before this Court today?

[JALLOH]: No.

[PROSECUTOR]: If the Court were to order you to answer questions, would you comply with that order and answer questions?

[JALLOH]: No.

*　　*　　*

[PROSECUTOR]: Sir, if you're held in contempt, will that affect your decision as to whether to testify or not?

[JALLOH]: No.

[PROSECUTOR]: And assuming that the Judge holds you in contempt for failing to obey his order, that is, compel you to testify, if you're held for a week, two weeks, a month, would that change your decision to testify?

[JALLOH]: It doesn't change anything.

THE COURT: All right. If I ask you those same questions, your answer would be the same?

[JALLOH]: Yes, Your Honor.

THE COURT: I'll make the finding he's in contempt of court for refusing to testify.

The circuit court elected to have Jalloh invoke his choice not to testify in front of the jury. The following exchange took place before the jury:

[PROSECUTOR]: [H]ave you had an opportunity to speak to your counsel about the consequences of not testifying today?

[JALLOH]: Yes, sir.

[PROSECUTOR]: And is it your intention to refuse to testify before this Court today?

[JALLOH]: Yes, sir.

[PROSECUTOR]: And are you aware that if you refuse to testify, the Judge could order you to actually testify today?

[JALLOH]: Yes, sir.

[PROSECUTOR]: And if you fail to obey that order, you can be held in contempt of court?

[JALLOH]: Yes, sir.

[PROSECUTOR]: And you understand that if you're held in contempt of court, the Judge can sentence you to a sentence that's consecutive to any time that you're currently serving at this time?

[JALLOH]: Yes, sir.

[PROSECUTOR]: And you understand that?

[JALLOH]: Yes, sir.

[PROSECUTOR]: Is it your intention to testify before this jury today and before this Court today?

[JALLOH]: No.

The circuit court asked if appellant's counsel had any questions, and appellant's counsel stated, "Satisfied, Your Honor." The circuit court stated, "All right. I have made a finding, which I'll make it subsequent, he has refused to testify, that he is in fact in contempt of court."

The circuit court asked Jalloh, "Your answers would be the same if I asked them as well?" Jalloh responded, "Yes, your Honor." The circuit court stated, "All right. And you would be in contempt of court having refused to testify. I'll make that finding."

Over appellant's objection, the circuit court allowed the prosecutor to read the transcript of Jalloh's prior testimony

into the record in the presence of the jury. Jalloh's grand jury testimony included the following: Jalloh had been incarcerated with appellant and Donnell Hunter, also known as "Fat Rat," at the Prince George's County Detention Center. On one occasion, while incarcerated, Jalloh heard Fat Rat tell appellant that "the only way you can go home is to kill the witness." Jalloh informed his attorney of the conversation and his attorney arranged a meeting between Jalloh and an Assistant State's Attorney. During the meeting, Jalloh told the Assistant State's Attorney that appellant had confessed to him that he killed Brown. Jalloh testified that, at some point after his meeting with the Assistant State's Attorney, appellant told him that he was going home because "[his] brother got rid of the witness." According to Jalloh, appellant told him that two men were killed and a girl had been shot.

As a witness for the defense, Detective Matthew Barba of the Prince George's County Police Department testified that Lammons picked a photo of Barnes out of a photo book as a person that "resembled" a man present at the October 2008 incident, and that, though she was shown a photograph of Rashadd, she did not identify or recognize him.

As a witness for the defense, Shropshire testified that he was best friends with Rashadd and the two shared an apartment in 2008. According to Shropshire, in October 2008, he (Shropshire) was employed as a custodian at a public school, and worked until 11:30 p.m. or midnight. Shropshire testified that he allowed Rashadd to use his 1999 Buick Regal for work on numerous occasions. Shropshire testified that he saw Rashadd the day after Ennels was murdered and Rashadd did not appear nervous or upset, and that he (Shropshire) did not see bloody clothing or a gun in their apartment.

On his own behalf, appellant testified, in essence, that he had been framed by Barnes. Appellant testified that he was not present at the theft of Brown's vehicle and that the other witnesses were all lying. According to appellant, he and Barnes had a significant dispute in which Barnes believed that appellant had "shot up" his house, and, thereafter, Barnes

broke appellant's jaw. Appellant testified that his truck had been stolen and that he believed Barnes to be responsible for the theft. According to appellant, Barnes had threatened that appellant would "catch a serious charge" if he reported the truck stolen.

Appellant's counsel played taped conversations between Jalloh and his wife to challenge Jalloh's testimony at a pretrial motion hearing that he (Jalloh) had conversations with his wife concerning whether to come forward and testify against appellant.

### Jury Instructions—Solicitation

Prior to closing arguments, the circuit court instructed the jury as to solicitation as follows:

> The defendant is charged with two separate counts of the crime of Solicitation to Commit Obstruction of Justice. That is preventing witness testimony or retaliation for testimony. A criminal solicitation is an effort to persuade another person to commit a crime. In order to convict the defendant of Solicitation, the State must prove, one, that the defendant urged, advised, induced, encouraged, requested, or commanded another person to commit Obstruction of Justice by Preventing Witness Testimony and/or Obstruction of Justice in Retaliation for Testimony; and two, that at the time the defendant made the oral or written efforts to persuade another person to commit Obstruction of Justice by Preventing Witness Testimony and/or Obstruction of Justice by Retaliation for Testimony, the defendant intended that the Obstruction of Justice Preventing the Witness Testimony and/or Obstruction of Justice for Retaliation for Testimony be committed.

> The crime of Solicitation is in the asking. It is not necessary that the Obstruction of Justice Preventing the Witness Testimony and/or Obstruction of Justice Retaliation for Testimony actually be committed.

### Sentencing

On December 14, 2010, the circuit court held the sentencing hearing. At sentencing, as to the merger of the convictions for solicitation, appellant's counsel argued as follows:

With regards to the second case, [appellant] was found guilty of two offenses which the lesser charge would merge with the second. That would be the solicitation to obstruct justice by retaliation for testimony of [ ] Ennels would merge with the solicitation to obstruct justice and murder of [ ] Ennels.

In response, the State argued:

With respect to the two solicitations, Your Honor, as the Court instructed the jury in its instruction, the solicitation is in the asking. And so it has to be asked two separate times, to retaliate and to prevent.

In addition, Your Honor, they are two separate criminal offenses. One is under Section 302 and the other is under Section 9–303.

Third, they refer to two separate aspects. One is retaliation for testifying against the grand jury. The other is an inducement to not testify at trial.

Fourth, Your Honor, they refer to two separate dates; one being March of '08 for the grand jury and the second being the October 2010 eventual trial.

The circuit court denied the request for merger.

### DISCUSSION

### I.

### Striking of Defense Counsel

### (1) Contentions

■ Appellant contends that the circuit court erred in granting the Motion to Strike, and argues that, as a result, he was denied the right to the attorney of his choice. Appellant asserts that the Sixth Amendment to the United States Con-

stitution and Article 21 of the Maryland Declaration of Rights set forth the right to assistance of counsel in a criminal prosecution and include a defendant's right to be "represented by counsel of his own selection." Appellant acknowledges that, in *Wheat v. United States*, 486 U.S. 153, 164, 108 S.Ct. 1692, 100 L.Ed.2d 140, *reh'g denied*, 487 U.S. 1243, 108 S.Ct. 2918, 101 L.Ed.2d 949 (1988), the Supreme Court recognized "a presumption in favor of [a [defendant]'s] counsel of choice," but held that the presumption is rebuttable. Relying on *State v. Goldsberry*, 419 Md. 100, 18 A.3d 836 (2011), appellant maintains that the circuit court failed to "properly contemplate and apply the relevant factors when denying [ ] his counsel of choice."

Relying on *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), appellant contends that a defendant "is entitled to waive his right to conflict-free counsel." Appellant asserts, however, that "the [circuit] court never inquired of [him] whether he was willing to waive his right to conflict free counsel, or whether he had discussed the issue with [ ] co-counsel who was not operating under a conflict or potential conflict." Appellant maintains that, "[e]ven if the [circuit] court properly determined that the potential for conflict was great, the [circuit] court entirely failed to give consideration to [ ] Tun's suggestion that he only be disqualified from cross-examining [ ] Jalloh, and not from the entire case."

Appellant contends that "where it would be particularly unfair to the litigation client to require it to choose between forgoing cross-examination of an important adverse witness . . . on the one hand, and replacing trial counsel after the litigation is long under way, on the other [hand,]" a "satisfactory solution may be the retention of another lawyer solely for the purpose of examining the principal lawyer's client."

The State responds that the circuit court properly exercised its discretion in granting the motion to strike. The State contends that Tun had a previous relationship with Jalloh, and that, pursuant to *Wheat*, appellant may not insist "on counsel

of an attorney who has a previous or ongoing relationship with an opposing party[.]" The State asserts that Jalloh provided Tun with confidential information while Tun represented him, that Jalloh refused to waive his attorney-client privilege, and that it was reasonable for the circuit court to disqualify Tun on this basis. The State maintains that Tun's knowledge of "recent, confidential information about [ ] criminal charges against Jalloh" would have been "unfair" to the State at trial. The State asserts that waiver by appellant would have been "ineffective in curing the impropriety" because "he [was] not the party prejudiced."

The State contends that the Sixth Amendment right to choose one's own counsel is not absolute, and that a trial court may disallow a choice of counsel that would "create serious risk of conflict of interest[.]" The State argues that, in light of Jalloh's failure to waive his attorney-client privilege, the circuit court "reasonably concluded that there was a showing of a serious potential for conflict." The State maintains that MLRPC Rules 1.7 and 1.9 prohibit Tun's representation of Jalloh because appellant's and Jalloh's matters are "substantially related."

The State contends that *Goldsberry* was decided more than two years after the circuit court's grant of the motion to strike, and that appellant identifies "no authority indicating that it is retroactive." Alternatively, the State argues that, if *Goldsberry* is applicable, "the circuit court's actions complied with the requirements of [the] case" because the circuit court held a hearing, heard from both sides, and made the requisite findings.

The State asserts that imposition of a "Chinese wall" would not have remedied the conflict, because it would not have remedied the "adversarial advantage" given to appellant through Tun's knowledge of confidential information about Jalloh.

In a reply brief, relying on *Whorton v. Bockting*, 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007), and *State v. Daughtry*, 419 Md. 35, 18 A.3d 60 (2011), appellant contends that the

Court of Appeals's holding in *Goldsberry* is applicable to this case because the case was pending appeal at the time *Goldsberry* was decided. Appellant argues that "the record does not demonstrate that the [circuit] court contemplated all of the relevant [*Goldsberry* ] factors" because the circuit court failed to: (1) inquire as to whether he would waive his right to conflict-free counsel; (2) consider whether having co-counsel cross examine Jalloh would uphold "the ethical standards of the profession"; or (3) consider the likelihood that Jalloh would not actually testify at trial.

## (2) Standard of Review

■ We review a circuit court's decision regarding the disqualification of counsel under the abuse of discretion standard. *See Wheat*, 486 U.S. at 163, 108 S.Ct. 1692 (The Supreme Court stated that the trial court did not exceed the "broad latitude which must be accorded it" in considering whether counsel had been properly disqualified.).

## (3) Law

### Right to Counsel of Choice

■ The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to ... have the Assistance of Counsel for his defen[s]e." U.S. Const. amend. VI. Article 21 of the Maryland Declaration of Rights provides, "That in all criminal prosecutions, every man hath a right to ... be allowed counsel[.]" Md. Dec. of R. art. 21. "The right to counsel includes the right of a defendant, who does not require court-appointed counsel, to select the counsel of his or her choosing." *Goldsberry*, 419 Md. at 117–18, 18 A.3d 836 (citations omitted).

In *Goldsberry, id.* at 118, 18 A.3d 836 the Court of Appeals explained that the right to counsel of choice is qualified, stating:

It is subject to the trial court's "independent interest in ensuring that criminal trials are conducted within the ethical

standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat,* 486 U.S. at 160 [108 S.Ct. 1692]; *accord Moore v. State,* 390 Md. 343, 405, 889 A.2d 325, 362 (2005) (stating that a defendant's right to counsel of choice "will not be permitted to frustrate[ ] the [ethical and] orderly administration of criminal justice"). This right to counsel, though protected by a presumption in favor of a defendant's counsel of choice, can be overcome. *Wheat,* 486 U.S. at 164 [108 S.Ct. 1692]. The presumption can be overcome if, for example, the defendant's attorney "has a previous or ongoing relationship with an opposing party." *Id.* at 159 [108 S.Ct. 1692]. And it can be overcome, "not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Id.* at 164 [108 S.Ct. 1692].

(Alterations in original).

In *Wheat,* 486 U.S. at 163–64, 108 S.Ct. 1692, the Supreme Court affirmed the trial court's denial of Wheat's request to substitute his original counsel with counsel representing two of his codefendants. Although the Supreme Court acknowledged that a defendant may waive the right to conflict-free representation, it ultimately determined that a trial court may decline to grant a waiver if it finds actual conflict. *Id.* at 162, 108 S.Ct. 1692. The Court concluded:

[T]he [trial] court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.

*Id.* at 163, 108 S.Ct. 1692. In *Wheat, id.* at 164, 108 S.Ct. 1692 the Court stated that the proper balance is struck when "the [trial c]ourt [ ] recognize[s] a presumption in favor of [the defendant's] counsel of choice," which "may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict."

In *Goldsberry*, 419 Md. at 123–24, 18 A.3d 836 the Court of Appeals discussed the framework to be used by the trial courts in determining whether to disqualify a defendant's counsel of choice based on a conflict of interest, stating:

> [B]efore a trial court is permitted to disqualify a criminal defendant's privately obtained counsel (regardless of whether counsel is the defendant's only attorney or one of several on the defense team), the court must conduct a hearing on the matter, scrutinize closely the basis for the claim, and make evidence-based findings to determine, based on factors such as those outlined in [*People v.*] *Ortega* [209 Ill.2d 354, 283 Ill.Dec. 530], 808 N.E.2d [496], 502 [ (2004) ], whether there is actual or serious potential for conflict that overcomes the presumption the defendant has to his or her counsel of choice. The record must reflect that the trial court contemplated relevant factors in conducting the test that balances the right to one's counsel of choice against the necessity to uphold the ethical standards of the profession that ensure that legal proceedings appear fair to all who observe them.

(Internal quotation marks and some citations omitted). The Court of Appeals explained the "relevant factors" that may be considered by a trial court in conducting the balancing test, "among all other factors relevant to the conflict," including:

> [T]he likelihood that defense counsel will have divided loyalties; the State's right to a fair trial; the appearance of impropriety should the jury learn of the conflict; and the likelihood that defense counsel's continued representation will provide grounds for overturning the conviction.

*Id.* at 123, 18 A.3d 836 (citing *Ortega*, 283 Ill.Dec. 530, 808 N.E.2d at 502.)

### Retroactive Application of Court Decisions

In *Daughtry*, 419 Md. at 77, 18 A.3d 60 the Court of Appeals addressed the issue of prospective versus retrospective application of an appellate decision as follows:

As explained in *American Trucking Ass'ns, Inc. v. Goldstein*, 312 Md. 583, 591, 541 A.2d 955, 958–59 (1988), "[i]n the overwhelming majority of cases, a judicial decision sets forth and applies the rule of law that existed both before and after the date of the decision.... [I]n the ordinary case, no issue of a 'prospective only' application arises." Where, however,

> a decision of this Court with regard to a constitutional provision, a statute, or a common law principle, is overruled on the ground that the decision represented an erroneous interpretation or application of the constitutional provision, statute, or common law principle, the question of whether the new ruling should be applied prospectively only is governed by the principles set forth in *Owens–Illinois* [*, Inc.*] *v. Zenobia*, 325 Md. 420, 470–72, 601 A.2d 633, 658 (1992)....

*Walker v. State*, 343 Md. 629, 637, 684 A.2d 429, 432–33 (1996).

(Footnotes and some internal citations omitted) (alterations in original).[7] The Court of Appeals explained, that, generally, "prospective application of a holding applies also to 'all other pending cases where the relevant question has been preserved for appellate review.' " *Id.* at 78 n. 26, 18 A.3d 60 (citation).

## Waiver of Conflict of Interest

In *U.S. v. Fulton*, 5 F.3d 605, 612, 614 (1993), the United States Court of Appeals for the Second Circuit reversed the conviction of the defendant because the trial court failed to disqualify the defendant's counsel in a case where a state's witness had made accusations of criminal conduct against the

---

**7.** In *Zenobia*, 325 Md. at 470, 601 A.2d 633, the Court of Appeals reviewed general principles concerning application of changed law. As to when a case is overruled on the ground that it was erroneously decided, the Court stated that the "two major considerations in determining whether a new holding is to be applied only prospectively are the purpose of the holding and the extent of reliance upon the overruled cases." *Id.* at 471, 601 A.2d 633.

defendant's counsel, though the defendant waived the conflict at trial.

In *Wheat,* 486 U.S. at 155–57, 108 S.Ct. 1692, the defendant was denied his attorney of choice because the attorney had a possible conflict of interest due to his representation of persons charged as co-conspirators. Although all of the defendants in *Wheat* were willing to waive the right to conflict-free counsel, the Supreme Court held that this was not always sufficient, because "[f]ederal courts have an independent interest in ensuring that trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160, 108 S.Ct. 1692. The Supreme Court acknowledged that rules of professional responsibility "impose limitations on multiple representation of clients." *Id.* The Court stated, "Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation." *Id.*

## Maryland Lawyers' Rules of Professional Conduct

MLRPC Rules 1.7, 1.8, and 1.9 govern Maryland attorneys' legal and ethical duties with respect to conflicts of interest. Rule 1.7, which provides the general rule for conflict of interest issues, states:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a conflict of interest. A conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

. . .

(4) each affected client gives informed consent, confirmed in writing.

Rule 1.8 sets forth the duties owed to a current client by his or her attorney. Rule 1.9, on the other hand, entitled "Duties to Former Clients," provides:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

. . .

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

### (4) Analysis

Returning to the case at hand, we are convinced that the circuit court properly granted the State's Motion to Strike. We address initially the State's argument that the Court of Appeals's holding in *Goldsberry* is inapplicable. In *Goldsberry,* the Court of Appeals's description of the factors to be considered in determining a conflict of interest does not overrule prior precedent or statutory authority. The procedure set out in *Goldsberry* is derived from the Supreme Court case of *Wheat.* In *Daughtry,* 419 Md. at 78 n. 26, 18 A.3d 60

the Court of Appeals explained that generally, "prospective application of a holding applies to 'all other pending cases where the relevant question has been preserved for appellate review.'" (Citation omitted). We need not explore the *Zenobia* principles to conclude that *Goldsberry* is applicable to the case.

Here, as required by *Goldsberry*, the circuit court held a hearing on the Motion to Strike, and "scrutinize[d] closely the basis for the claim" by hearing extensively from both sides on the issue and taking evidence. *Goldsberry*, 419 Md. at 123, 18 A.3d 836. The circuit court found that appellant "waived whatever conflict [ ] Tun might have," but that Jalloh "ha[d] not[,]" and that Jalloh "takes significant exception to [ ] Tun continuing to participate in this case when he, in fact, is going to be a witness for the State." As such, the circuit court determined that there was "a conflict with the duty of loyalty."

The record reflects that, as described in *Ortega*, 283 Ill.Dec. 530, 808 N.E.2d at 502, the circuit court considered the likelihood that appellant's counsel would have divided loyalties. Specifically, the circuit court observed that "[t]here [was a] conflict with the duty of loyalty" and that it was "a significant one[.]" The circuit court acknowledged that Tun represented Jalloh "for a short period of time" but found that the "duty of loyalty continues[.]" The circuit court considered Tun's suggested remedy of utilizing other counsel to cross-examine Jalloh. The circuit court ruled, however, that "[t]o say that we can create a Chinese wall, a masonry wall, a brick or a block wall that solves this problem I think is folly. I just don't believe that we can do that. Having said all that, accordingly, I'm going to direct the Clerk to strike [ ] Tun's appearance."

In sum, the circuit court found that there was a conflict of interest that could not be cured. The circuit court explained "there [ ] really is truly a conflict were this case to go to trial with [ ] Tun at the table." In the circuit court's view, the risk of conflict outweighed appellant's right to counsel of choice. Simply put, we agree.

## Waiver of Conflict of Interest

Although, at times, a defendant may waive his right to conflict-free counsel without jeopardizing the propriety of the trial, as explained in *Fulton*, 5 F.3d at 614, and as provided in *Wheat*, 486 U.S. at 160, 108 S.Ct. 1692, a defendant's waiver of the conflict is not always sufficient to cure the conflict. Here, it is clear from the record that the circuit court was aware that appellant was willing to waive any perceived conflict to keep Tun as his counsel. This does not mean, however, that the circuit court was required to accept the waiver as a cure for the conflict. The circuit court considered MLRPC Rule 1.9(c)(1).

The court held that the "duty of loyalty" created by the MLRPC prohibited Tun from representing appellant, where Jalloh refused to give informed consent confirmed in writing. As such, as explained by the Supreme Court in *Wheat*, the circuit court recognized that the MLRPC imposed limitations on the use of information related to former clients. We are not persuaded that the circuit court erred or abused its discretion by refusing to accept appellant's waiver of Tun's potential conflict of interest.

## Use of Alternate Counsel to Cure the Conflict of Interest

The circuit court considered the proposed solution of use of unaffiliated co-counsel and rejected it as insufficient to cure the conflict. The State argued that use of co-counsel may not have been sufficient to cure the conflict, as co-counsel would maintain a strategic advantage, and could lead to reversal on appeal. The circuit court was not required to adopt use of co-counsel as a solution where the court perceived that the risk of conflict would persist.

In *United States v. Agosto*, 675 F.2d 965, 974 (8th Cir.1982), the United States Court of Appeals for the Eighth Circuit explained why appointment of co-counsel is not always a cure-all. The Court stated that, if unaffiliated co-counsel were allowed to cross-examine the witnesses, the Court was concerned that

after the trial of this case, should [the defendant] be convicted, he may be moved to file a post-conviction motion alleging ineffective assistance of counsel because backup counsel did not have as full a degree of familiarity with the issues and facts as did [the original counsel] and, therefore, did not effectively cross-examine the witnesses.

*Id.*

In *Agosto,* the Court advised that, if the original defense counsel were retained, trial court should inquire of the defendant's willingness to waive any claim of ineffective assistance of counsel "insofar as that right may be impinged upon by [original counsel's] conflicts of interest and the need to employ backup counsel to alleviate those conflicts." *Id.* In this case, given that appellant never asserted that he would waive an ineffective assistance of counsel claim against Tun concerning the use of co-counsel to cross-examine Jalloh, we conclude that the circuit court did not abuse its discretion in rejecting the proposed solution.[8]

---

**8.** Appellant argues that "[n]umerous state courts have found that when a criminal defendant waives his right to conflict free counsel, it [is] error to disqualify the defendant's counsel of choice, even when said counsel previously represented a state's witness." Appellant relies on the Florida cases of *DeArce v. State,* 405 So.2d 283 (Fla.Dist.Ct.App. 1st Dist.1981) and *Freeman v. State,* 503 So.2d 997, 998 (Fla.Dist.Ct.App. 3d Dist.1987) to support this argument.

In *DeArce,* 405 So.2d at 285, the District Court of Appeal of Florida stated:

When it appears that defense counsel has a potential conflict of interest due to the receipt of privileged communications from a state's witness, it is the trial court's duty to insure that the defendant fully understands the disabilities the conflict places on his defense and the adverse consequences that may result from such representation. However, if the defendant, after being fully informed of the ramifications of his decision, chooses to waive his right to conflict-free counsel, he may do so.

(Internal citations omitted). In *Freeman,* 503 So.2d at 998, relying on *DeArce,* the District Court of Appeal of Florida held that the existence of a conflict of interest is not dispositive because the defendant has a constitutionally guaranteed right to counsel of his choice.

The holdings in *DeArce* and *Freeman* were circumscribed, however, by the United States Supreme Court's holding in *Wheat,* 486 U.S. at 162, 108 S.Ct. 1692, in which the Supreme Court explained that

In this case, it is clear from the record that the circuit court was informed that appellant was willing to waive any conflict. The circuit court found, however, that the conflict was too severe to be waived. We are satisfied that the circuit court correctly considered the factors described in *Goldsberry* and *Wheat,* and did not abuse its discretion in granting the Motion to Strike.

## II.

### Jalloh's Prior Testimony

### (1) Contentions

Appellant contends that the circuit court erred in permitting the State to introduce Jalloh's prior testimony where Jalloh testified at the hearing on the admission of Ennels's testimony but refused to testify at trial. Appellant argues that Jalloh's prior testimony is hearsay and not admissible under Maryland Rule 5–804 because: (1) Jalloh was not unavailable to testify as required by Rule 5–804(a); and (2) appellant did not have an opportunity or similar motive to develop Jalloh's testimony by cross-examination at the prior motion hearing as required by Rule 5–804(b).

Appellant contends that, because the first hearing was a motion hearing, and not a trial, appellant did not have "an interest of substantially similar intensity to disprove [ ] Jalloh's credibility." Appellant asserts that the motion hearing was "held over a year before trial and before 1,000 pages of discovery had been provided by the State." Appellant maintains that, because his counsel "may have believed that the motion hearing was [a] fruitless effort," his "motive to discredit [ ] Jalloh would have been severely lacking."

As to opportunity, appellant contends that "[his] counsel learned numerous things at the motion hearing that he was

"where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver[.]"

later able to investigate and disprove." Among the information learned, appellant's counsel argues that he listened to the taped jail calls between Jalloh and his wife, and did not hear Jalloh stating to his wife that he desired to "do the right thing." [9] Appellant asserts that, after the motion hearing, his counsel obtained jail records that show that Jalloh, Hunter, and appellant were never housed together.

The State responds that the issue is not preserved for review because appellant failed to argue at trial that the requirements of Maryland Rule 5–804(b) were not satisfied. Alternatively, the State contends that "the record shows that the witness was unavailable[,]" and that appellant had an "opportunity and similar motive" to cross-examine Jalloh at the hearing. The State maintains that appellant provides "no authority for the proposition that 'opportunity' requires that he be in possession of the same information as he had at trial[,]" and that any error, if at all, is harmless beyond a reasonable doubt.

### (2) Standard of Review

In *Bernadyn v. State*, 390 Md. 1, 7–8, 887 A.2d 602 (2005), the Court of Appeals discussed the standard of review for hearsay rulings as follows:

> We review rulings on the admissibility of evidence ordinarily on an abuse of discretion standard. Review of the admissibility of evidence which is hearsay is different. Hearsay, under our rules, *must* be excluded as evidence at trial, unless it falls within an exception to the hearsay rule excluding such evidence or is "permitted by applicable constitutional provisions or statutes." Thus, a circuit court has no discretion to admit hearsay in the absence of a

---

**9.** At the hearing on the Motion to Admit Testimony, Jalloh testified that he had spoken with his wife on the telephone about whether to disclose his knowledge that a witness may be killed in appellant's case, and later about his knowledge that the witness had been killed.

provision providing for its admissibility. Whether evidence is hearsay is an issue of law reviewed *de novo.*

(Emphasis in original) (citations omitted).

### (3) Law

### Hearsay

Maryland Rule 5–804 provides an exception to the general rule excluding hearsay when a declarant is unavailable to testify, stating, in pertinent part:

(a) Definition of Unavailability. "Unavailability as a witness" includes situations in which the declarant:

. . .

(2) refuses to testify concerning the subject matter of the declarant's statement despite an order of the court to do so;

. . .

(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former Testimony. Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

█ The prior testimony of an unavailable declarant may only be admitted if the declarant is truly unavailable. *Higgins v. State,* 41 Md.App. 177, 186, 396 A.2d 311 (1979). The party seeking the admission of the former testimony must demonstrate that it made a good faith effort to procure the unavailable declarant. *Id.*

### Unavailability

In *Mullaney v. Aude,* 126 Md.App. 639, 661–62, 730 A.2d 759 (1999), this Court reviewed whether a witness was unavailable under Maryland Rule 5–804. In *Mullaney, id.* at 659–60,

730 A.2d 759, the witness refused to testify at a hearing on attorneys fees. Over appellants' objection, appellee's attorney read from the witness's affidavit. *Id.* at 661, 730 A.2d 759. This Court held that the witness "was not unavailable according to the definition of 'unavailability' in the Rule-she apparently refused to testify, but she did not refuse under a court order as the Rule requires." *Id.* at 661, 730 A.2d 759 (citing Md. R. 5–804(a)(2)).

In *Tyler v. State,* 342 Md. 766, 778, 679 A.2d 1127 (1996), the Court of Appeals stated: "If a witness simply refuses to testify, despite the bringing to bear upon him of all appropriate judicial pressures, the conclusion that as a practical matter he is unavailable can scarcely be avoided, and that is the holding of the great weight of authority." (Citation omitted).

### Prior Testimony

■ If a trial court determines that a declarant is unavailable, his or her former testimony may be admitted if the party against whom the declarant's testimony is offered had an "opportunity and similar motive to develop the testimony of the witness when the prior statement was made, by direct, cross- or redirect examination." *Dulyx v. State,* 425 Md. 273, 284–85, 40 A.3d 416 (2012) (citing Md. R. 5–804(b)(1)) (internal quotation marks omitted). The opportunity to develop testimony "is generally satisfied when the defense [was] given a full and fair opportunity to probe and expose [the] infirmities [of the testimony] through cross-examination." *Id.* at 285, 40 A.3d 416 (citation and internal quotation marks omitted).

In *Dulyx, id.* at 289, 40 A.3d 416 the Court of Appeals held that the suppression hearing testimony of a State's witness could not be used during trial because the defendant was not afforded an opportunity to cross-examine the witness during the suppression hearing. The Court concluded that the defendant's ability to probe the witness's sincerity, perception, and recollection of the events was hindered by the trial court's explicit instructions, which limited the scope of the defendant's inquiry by permitting defendant's counsel only "a single ques-

tion testing [the witness's] ability to recall details[.]" *Id.* at 289–90, 40 A.3d 416.

In *Williams v. State,* 416 Md. 670, 684–85, 697–98, 7 A.3d 1038 (2010), the Court of Appeals held that the former in-court testimony of a State's witness, who had since died, could not be used in a new trial against the same defendant because, prior to her testimony, the State had not disclosed the fact that the witness considered herself legally blind. The Court concluded that, although the defendant had an opportunity to cross-examine the witness, it was inadequate and diminished the witness's overall reliability. *Id.* at 697–98, 7 A.3d 1038.

As to the development of testimony, in *Williams,* 416 Md. at 696, 7 A.3d 1038 the Court of Appeals stated:

A motive to develop testimony is sufficiently similar for purposes of Rule 804(b)(1) when the party now opposing the testimony would have had, at the time the testimony was given, "an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue" now before the court. *United States v. Carneglia,* 256 F.R.D. 366 [ (E.D.N.Y.2009) ], quoting *United States v. Di-Napoli,* 8 F.3d 909, 914–15 (2d Cir.1993).

In *Williams,* 416 Md. at 697, 7 A.3d 1038 the Court of Appeals explained:

"The way to determine whether or not motives are similar is to look at the issues and the context in which the opportunity for examination previously arose, and compare that to the issues and context in which the testimony is currently proffered. The similar motive inquiry is essentially a hypothetical one: is the motive to develop the testimony at the prior time similar to the motive that would exist if the declarant were produced (which of course he is not) at the current trial or hearing?"

(Citation omitted).

### (4) Analysis

### Preservation

A review of the record reveals that appellant made no objection to the circuit court's finding that Jalloh was unavail-

able. Upon the circuit court finding Jalloh unavailable, appellant's counsel stated, "Your Honor, we're deferring on the issue of unavailability at this time." Instead, appellant's counsel argued that Jalloh's prior testimony was inadmissible because the introduction of the testimony would violate *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), in that appellant's counsel did not vigorously cross-examine Jalloh at the hearing because he did not have the same motivation and because the hearing was not before a jury. Given that appellant's counsel did not object to the circuit court's finding as to Jalloh's unavailability, appellant has not preserved the issue for review. *See* Md. R. 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]").

### Unavailability of Jalloh

Although the issue is unpreserved, we are nonetheless satisfied that the circuit court properly concluded that Jalloh was "unavailable" for purposes of Maryland Rule 5–804(b)(1). In this case, Jalloh advised many times that he refused to testify. Outside of the presence of the jury, the State asked Jalloh, "If the Court were to order you to answer questions, would you comply with that order and answer questions?" Jalloh replied, "No." The State asked Jalloh, "[I]f you're held in contempt, will that affect your decision as to whether to testify or not?" Jalloh answered, "No." The State asked Jalloh if the court holds him in contempt for a week or two weeks, would that change his decision to testify, and Jalloh answered, "It doesn't change anything." The circuit court asked Jalloh, "If I ask you those same questions, your answer would be the same?" Jalloh replied, "Yes, Your Honor." The court made a finding that Jalloh was in contempt of court for refusing to testify. Next, in the presence of the jury, the State asked Jalloh substantially similar questions, to which his responses were the same, and then the circuit court made a

finding that Jalloh "ha[d] refused to testify" and that he was "in fact in contempt of court." [10]

Although the circuit court did not specifically order Jalloh to testify, the circuit court made clear that Jalloh was being held in contempt for refusing to testify. The circuit court made two findings as to Jalloh's contempt, one outside of the presence of the jury and one before the jury. By finding Jalloh in contempt twice, the circuit court found that Jalloh could be penalized.

In *Gaskins v. State,* 10 Md.App. 666, 677, 272 A.2d 413 (1971), *cert. denied,* 404 U.S. 1040, 92 S.Ct. 719, 30 L.Ed.2d 732 (1972), this Court stated, "We think a witness who steadfastly refuses to testify under the penalty of contempt is, in effect, 'unavailable' as a witness." Although, in *Gaskins,* the trial court did not advise the witness of the maximum penalty of contempt or appoint him a lawyer, we upheld the finding of unavailability. *Id.* at 678 n. 5, 272 A.2d 413. Here, Jalloh steadfastly refused to testify, under the penalty of contempt. Jalloh faced "all appropriate judicial pressures" and still refused to testify. *Tyler,* 342 Md. at 778, 679 A.2d 1127 (citation omitted). We conclude that, because Jalloh was subject to contempt, the circuit court did not err in finding, under Rule 5–804(a)(2) that Jalloh was unavailable.

### Sufficiency of the Opportunity to Cross–Examine Jalloh

We next address appellant's argument that he did not have an opportunity or similar motive to develop Jalloh's testimony by cross-examination at the prior motion hearing as required by Rule 5–804(b). At the motion hearing, Jalloh's

---

**10.** Based on our review of the record, the circuit court held Jalloh in direct criminal contempt, and consistent with Maryland Rule 15–203 intended to defer imposition of sanctions to a later date. *See Fisher v. McCrary Crescent City, LLC,* 186 Md.App. 86, 115, 972 A.2d 954 (2009), *cert. denied,* —— U.S. ——, 131 S.Ct. 637, 178 L.Ed.2d 476 (2010) ("Once the court finds that a direct contempt-either civil or criminal-has occurred, the court must determine whether to impose summary sanctions, defer imposing sanctions until the conclusion of the proceeding where the alleged contemnor committed the contempt, or issue the sanctions after holding a hearing.").

testimony was presented by the State to demonstrate that appellant killed Brown, and that he directed the murder of Ennels to preclude Ennels from testifying against him at his trial for the murder of Brown. Appellant's counsel's aim, on cross-examination, was to discredit Jalloh to the best of his ability, with any impeaching evidence available. If Jalloh had been produced at trial by the State, the State's purpose for presenting his testimony would have been the same—*i.e.* to demonstrate that appellant killed Brown and directed the murder of Ennels. Appellant's counsel's aim on cross-examination would again have been to discredit Jalloh's testimony to the best of his ability.

Although appellant contends that he could not cross-examine Jalloh as to newly discovered evidence, at trial appellant produced evidence of taped jail calls and the jail records allegedly showing that: (1) Jalloh did not discuss "do[ing] the right thing" with his wife, and (2) appellant, Hunter, and Jalloh were never housed together. Thus, the jury was apprised of the evidence that appellant claims was unavailable to him at the motion hearing.

Because Jalloh's testimony was offered for a similar purpose by the State at both proceedings, and because appellant's counsel had an opportunity to full cross-examination of Jalloh at the first hearing, we are satisfied that appellant's counsel had a similar motive and an interest of "substantially similar intensity" to discredit Jalloh at the motion hearing as would have existed at trial. The circuit court, thus, did not err in admitting Jalloh's prior testimony pursuant to Maryland Rule 5–804(b)(1).

## III.

### Ennels's Grand Jury Testimony

#### (1) Contentions

 Appellant contends that the circuit court erred in admitting the grand jury testimony of Ennels. Appellant argues that Ennels's testimony was hearsay and that the State

failed to demonstrate that the testimony was admissible under C.J.P. § 10–901, which permits the admittance of hearsay statements where a defendant is responsible for the unavailability of a witness. Appellant asserts that the State did not establish by clear and convincing evidence that he "engaged in, directed, or conspired to commit the wrongdoing that was intended to and did procure the unavailability of the [witness]."

The State contends that the evidence presented at the hearing was more than sufficient to support the circuit court's finding that appellant "engaged in, directed, or conspired to commit the wrongdoing." The State asserts that both the circumstance that "[appellant] was the obvious beneficiary of the murder," and that the murder was committed by a family member with whom appellant had close contact support the circuit court's finding. The State contends that C.J.P. § 10–901 "does not require direct evidence of solicitation, and it is well established that circumstantial evidence is not inferior to direct evidence." The State argues that, "in *Colkley* [*v. State,* 204 Md.App. 593, 42 A.3d 646 *cert. granted,* 429 Md. 81, 54 A.3d 759 (2012) ], this Court did not purport to establish the outer limits of the type of factual proof that would suffice under the statute, so it is irrelevant whether there is direct evidence of solicitation."

### (2) Law

Pursuant to Maryland Rule 5–804(b)(5)(B), "[i]n criminal causes in which a witness is unavailable because of a party's wrongdoing, admission of the witness's statement under this exception is governed by [C.J.P.] § 10–901." C.J.P. § 10–901, in turn, provides, in relevant part:

(a) In general.—During the trial of a criminal case in which the defendant is charged with a felonious violation of Title 5 of the Criminal Law Article or with the commission of a crime of violence as defined in § 14–101 of the Criminal Law Article, a statement as defined in Maryland Rule 5–801(a) is not excluded by the hearsay rule if the statement is offered against a party that has engaged in, directed, or

conspired to commit wrongdoing that was intended to and did procure the unavailability of the declarant of the statement, as defined in Maryland Rule 5–804.

(b) Hearing.—Subject to subsection (c) of this section, before admitting a statement under this section, the court shall hold a hearing outside the presence of the jury at which:

(1) The Maryland Rules of Evidence are strictly applied; and

(2) The court finds by clear and convincing evidence [11] that the party against whom the statement is offered engaged in, directed, or conspired to commit the wrongdoing that procured the unavailability of the declarant.

(c) Exceptions.—A statement may not be admitted under this section unless:

(1) The statement was:

(i) Given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition[.]

In *Colkley,* 204 Md.App. at 637–39, 42 A.3d 646 this Court affirmed a trial court's determination that a defendant conspired to "commit the wrongdoing that procured the unavailability of the declarant" based on testimony of a co-conspirator who testified that the defendant told him that "they had to get rid of [the witness] because without [the witness], [the State] won't have no case." We concluded that the statement made between the defendant and the coconspirator satisfied the clear and convincing evidence standard required by C.J.P. § 10–901. *Id.*

### (3) Analysis

Returning to the case at hand, we conclude that the circuit court properly determined by clear and convincing evidence

---

**11.** In *Whittington v. State,* 8 Md.App. 676, 679 n. 3, 262 A.2d 75 (1970), we defined "clear and convincing evidence" as "more than a preponderance of the evidence and less than evidence beyond a reasonable doubt[.]"

that appellant engaged in, directed, and conspired to commit the murder of Ennels, and intended to and did procure Ennels's unavailability at his trial. As required under C.J.P. § 10–901(b), to determine the admissibility of the prior testimony, the circuit court held a hearing, outside of the presence of the jury, at which the Maryland Rules of Evidence were strictly applied. At the hearing, Lammons testified that on October 7, 2008, two men approached her car on Nalley Road and began shooting. They shot Ennels as he sat in the car and they shot at her as she ran away. She was shot in the elbow but was able to escape. Lammons described the gunmen as follows: "One was brown-skinned, had dreads, had on all black. The other one, brown-skinned, he had a haircut and was in black."

Officer Nolasco testified that while responding to a call for the Nalley Road shooting, he "observe[d] two vehicles leaving the scene at a high rate of speed." He pulled over one of the vehicles and found that Rashadd was driving it. Officer Nolasco testified that Rashadd was "extremely nervous, shaking" and that there was blood on his white shirt "under the left side of his arm."

Perruzzi, the Prince George's County police department evidence technician, testified that she found a "black nylon skull cap" lying out in the middle of the backyard of 404 Nalley Road. Charak, a forensic chemist and DNA analyst with the Prince George's County Police Department Serology/DNA Laboratory, testified that the DNA found on the skull cap was consistent with the DNA profile of Rashadd as the major contributor, though two other minor contributors were also detected. Charak testified that "the chances of selecting an unrelated individual was one in 34.4 quadrillion individuals in the African American population."

Detective Turner testified that the signal from the cellular telephone that last called Ennels's telephone was "hitting off" of towers associated with a path that led to Nalley Road. After the shooting, the same cellular telephone was pinpointed at a location on Swan Terrace before it was powered off. Detec-

tive Turner testified that Rashadd frequented his aunt's home on Swan Terrace.

Lammons's physical description of one of the two gunmen matched the appearance of Rashadd. The DNA on the skull cap placed Rashadd in the yard that Cash was chased through. Rashadd was stopped by Officer Nolasco along one of a few possible routes away from the scene approximately twenty minutes after the incident. He had blood on his shirt and was "extremely nervous" and "shaking[.]" The cellular phone used to call Ennels last was traced to Swan Terrace, where Rashadd is known to stay with his aunt. Based on the evidence above, the circuit court did not err in concluding that there was clear and convincing evidence Rashadd was one of the two gunmen that killed Ennels and Cash, and wounded Lammons.

Equally as important, we conclude that the circuit court did not err in finding by clear and convincing evidence that appellant "engaged in, directed, or conspired to commit" Ennels's murder. C.J.P. § 10–901(a). At the hearing, Jalloh testified that he heard Hunter tell appellant, "The only way you can be guaranteed to go home is to kill the witness, get rid of the witness." Jalloh testified that appellant told him that the police let the witness go and that he was trying to determine the location of the witness. Jalloh also testified that appellant told him, "My brother got rid of the witness."

Edmonds testified that, about a month after Brown's death, appellant talked to him "[a]bout killing [Ennels], because he know he going snitch him out." Detective Cheney testified that he listened to a phone call between Shropshire and appellant on October 3, 2008, in which Shropshire stated to appellant, "You still haven't told me what you want to do with that [guy]."

The evidence of appellant's conversations with Jalloh and Edmonds demonstrates an intent by appellant to have Ennels killed.[12] Appellant's conversation with Shropshire on October

---

**12.** Appellant argues that direct evidence of solicitation of the type found in *Colkley* is "simply not present in [a]ppellant's case." In *Colkley,* 204

3, 2008, four days before the murder, provides circumstantial evidence that appellant directed Shropshire to do something about Ennels. The murder was carried out by appellant's brother and another unidentified man within one month of appellant's original trial date of November 3, 2008. After the shooting, appellant told Jalloh that his brother "got rid of the witness." In light of the evidence above, we could reach no conclusion other than that the circuit court properly admitted Ennels's grand jury testimony under C.J.P. § 10–901.

## IV.

### Sentencing for Solicitation

#### (1) Contentions

Appellant contends that the circuit court erred in sentencing him for two counts of solicitation where there was only one act of incitement, and as such, one of the sentences must be vacated. Appellant argues that although the "two counts of solicitation had separate motives, one to prevent future testimony and one to retaliate for past testimony, there was but one incitement" and one act of murder. Appellant maintains that solicitation is similar to conspiracy, and contends that "it is clear that consecutive sentences are not allowed where there is one criminal conspiracy with multiple objectives."

The State responds that the circuit court properly imposed separate sentences for separate convictions of solicitation under two different statutes. The State argues that the circum-

---

Md.App. at 638–39, 42 A.3d 646 a witness's taped statement to police was accepted as evidence pursuant to C.J.P. § 10–901(b), where the witness's death was found to have been procured at the behest of the defendant against whom the witness was supposed to testify. In *Colkley, id.* at 638, 42 A.3d 646 the State presented evidence that the defendant spoke on the telephone with co-conspirators and told them that "they had to get rid of [the witness] because without [the witness], they won't have no case." The witness was then killed within two hours of the conversation. *Id.* at 635, 42 A.3d 646. In *Colkley*, this Court made no findings as to the standards for establishing solicitation by clear and convincing evidence, *i.e.* this Court did not hold that the State was required to present direct evidence of the solicitation.

stances of this case give rise to the inference of "multiple solicitations" and weigh in favor of separate sentences. The State asserts that "the jury could have reasonably concluded that there were separate solicitations at separate times with separate goals that violated the separate statutes and thus separate sentences are warranted."

### (2) Law

### Relevant Statutes

C.L. § 9–302 provides:

Inducing false testimony or avoidance of subpoena

. . .

(b) Solicitation prohibited.—A person may not solicit another person to harm another, threaten to harm another, or damage or destroy property with the intent to:

(1) influence a victim or witness to testify falsely or withhold testimony; or

(2) induce a victim or witness:

(i) to avoid the service of a subpoena or summons to testify;

(ii) to be absent from an official proceeding to which the victim or witness has been subpoenaed or summoned; [ ]

. . .

(c) Penalty.—

. . .

(2) If the testimony, subpoena, official proceeding, or report involving the victim or witness relates to a felonious violation of Title 5 of this article or the commission of a crime of violence as defined in § 14–101 of this article, or a conspiracy or solicitation to commit such a crime, a person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 20 years.

(d) Sentence.—A sentence imposed under this section may be separate from and consecutive to or concurrent with a

sentence for any crime based on the act establishing the violation of this section.

C.L. § 9–303 provides:

Retaliation for testimony

. . .

(b) Solicitation prohibited.—A person may not solicit another person to intentionally harm another, threaten to harm another, or damage or destroy property with the intent of retaliating against a victim or witness for:

(1) giving testimony in an official proceeding; or

(2) reporting a crime or delinquent act.

(c) Penalty.—

. . .

(2) If the official proceeding or report described in subsection (a) of this section relates to a felonious violation of Title 5 of this article or the commission of a crime of violence as defined in § 14–101 of this article, or a conspiracy or solicitation to commit such a crime, a person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 20 years.

(d) Sentence.—A sentence imposed under this section may be separate from and consecutive to or concurrent with a sentence for any crime based on the act establishing the violation of this section.

## The Required Evidence Test

In *Purnell v. State,* 375 Md. 678, 693–95, 827 A.2d 68 (2003), *superseded by statute on other grounds as stated in Rich v. State,* 205 Md.App. 227, 44 A.3d 1063 (2012), the Court of Appeals explained the "required evidence test" for merger of convictions for sentencing purposes, stating:

Generally, this Court has relied upon the *Blockburger* [*v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) ] "required evidence test" in resolving double jeopar-

dy challenges involving two offenses stemming from the same act or acts....

We outlined the application of the required evidence test in *Williams* [*v. State,* 323 Md. 312, 593 A.2d 671 (1991) ] as follow[s]:

. . .

The required evidence test focuses upon the elements of each offense; if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter. The test was explained in *Thomas v. State,* 277 Md. 257, 267 [353 A.2d 240 (1976) ] as follows:

The required evidence is that which is minimally necessary to secure a conviction for each ... offense. If each offense requires proof of a fact which the other does not, or in other words, if each offense contains an element which the other does not, the offenses are not the same for double jeopardy and merger purposes, even though arising from the same conduct or episode. But, where only one offense requires proof of an additional fact, so that all elements of one offense are present in the other, the offenses are deemed to be the same for double jeopardy and merger purposes.

. . .

This does not end the inquiry, however, because the focus is upon the intent of the Legislature. [T]he *Blockburger* rule does not provide the final answer in cases involving multiple punishment because, when specifically authorized by the legislature, cumulative sentences for the same offense may under some circumstances be imposed after a single trial[ ]. In such instances, the appropriate measure of the allowable unit of prosecution would be what the legislature intended. Indeed, our primary task in a unit of prosecution analysis is to find and give effect to the legislative intent underlying the statute.

(Some citations, emphasis, and internal quotation marks omitted) (one omission in original).

### Rule of Lenity

In *Miles v. State*, 349 Md. 215, 227–28, 707 A.2d 841 (1998), the Court of Appeals explained the rule of lenity as follows:

"When two offenses do not merge under the required evidence test, we have applied as a principle of statutory construction the 'rule of lenity,' which 'provides that doubt or ambiguity as to whether the legislature intended that there be multiple punishments for the same act or transaction "will be resolved against turning a single transaction into multiple offenses." ' "

(Citations omitted).

In *Williams v. State*, 323 Md. 312, 321, 593 A.2d 671 (1991), the Court of Appeals stated that, in addition to the rule of lenity, "we have looked to other considerations in deciding whether two offenses, when based on the same conduct, should be deemed the same." In *Williams, id.*, the Court stated:

[L]ike other canons of statutory construction, the rule of lenity is neither absolute nor exclusive. Other considerations may also be applicable in arriving at a principled decision. For example, in deciding merger questions, we have examined the position taken in other jurisdictions. We have also looked to whether the type of act has historically resulted in multiple punishments. The fairness of multiple punishments in a particular situation is obviously important.

(Citations omitted).

In *Morris v. State*, 192 Md.App. 1, 993 A.2d 716 (2010), this Court addressed the issue of merger and the rule of lenity. We explained:

[t]he Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and the common law of Maryland guard against "multiple punishments for the same conduct, unless the Legislature clearly intended to impose multiple punishments." *Jones v. State*, 357 Md. 141, 156,

742 A.2d 493 (1999). To evaluate the legality of the imposition of separate sentences for the same act, we look first to whether the charges "arose out of the same act or transaction," then to whether "the crimes charged are the same offense," *id.* at 157 [742 A.2d 493], and then, if the offenses are separate, to whether "the Legislature intended multiple punishment for conduct arising out of a single act or transaction which violates two or more statutes. . . ." *Id.* at 163 [742 A.2d 493].

*Id.* at 39, 993 A.2d 716.

### Other Relevant Case Law

In *Meyer v. State,* 47 Md.App. 679, 425 A.2d 664, *cert. denied,* 454 U.S. 865, 102 S.Ct. 327, 70 L.Ed.2d 166 (1981), this Court reviewed a defendant's convictions on four separate counts of solicitation. The defendant argued that only one criminal solicitation occurred and, therefore, four separate sentences were inappropriate. *Id.* at 686–87, 425 A.2d 664. In *Meyer, id.* at 688, 425 A.2d 664, we stated that the "real issue" was "not whether there are separate crimes that should be merged, but whether there were, in the first place, separate crimes established by the evidence." The issue was "not one of merger, but of evidentiary sufficiency in light of the nature of the crime of criminal solicitation." *Id.* In *Meyer, id.* at 690, 425 A.2d 664, we held that there were four separate acts of incitement that were supported by the record, and, on that basis, we upheld all four convictions for solicitation.

### (3) Analysis

In this case, the question raised by appellant is "one of merger," and not one of "evidentiary sufficiency" for the two convictions. On brief, appellant contends:

There was but one incitement here, that by [a]ppellant to Rashadd [ ] to kill [ ] Ennels. That the solicitation may have had two goals does not convert one crime into two. The trial court erred in imposing consecutive sentences on the two counts of solicitation and one of the sentences must be vacated.

Given that appellant argues the circuit court erred in imposing consecutive sentences for the two counts of solicitation, the issue is not the sufficiency of the evidence for conviction under the two separate statutes, *i.e.* retaliation, C.L. § 9–303, and prevention from testifying at trial, C.L. § 9–302. The question is whether the circuit court properly refrained from merging the sentence for solicitation in retaliation for Ennels's grand jury testimony under C.L. § 9–303 and the sentence for solicitation to prevent Ennels's appearance as a witness at trial under C.L. § 9–302.

### Merger Under the Required Evidence Test

■ Pursuant to the required evidence test the sentences for solicitation would not merge. Applying the "required evidence test," we conclude that the two statutes each require proof of a fact that the other does not. C.L. § 9–302(b) requires a finding that the solicitation was undertaken with the intent to:

(1) influence a victim or witness to testify falsely or withhold testimony; or

(2) induce a victim or witness:

(i) to avoid the service of a subpoena or summons to testify;

(ii) to be absent from an official proceeding to which the victim or witness has been subpoenaed or summoned; or

(iii) not to report the existence of facts relating to a crime or delinquent act.

C.L. § 9–303(b), conversely, requires a finding that the solicitation was undertaken with the intent of "retaliating against a victim or witness for: (1) giving testimony in an official proceeding; or (2) reporting a crime or delinquent act." As the elements of intent set forth in the two statutes are separate, merger is not warranted under the required evidence test.

### Merger Under the Rule of Lenity and the
### Principles of Fundamental Fairness

■■■ The question we must now address is whether there is an indication that the General Assembly intended multiple or joint punishments for a violation of C.L. § 9–302 and C.L. § 9–303, where a defendant was found to have acted in both retaliation for prior testimony and to prevent future testimony. Upon review of the statutes, there is no indication that the General Assembly's purpose was to punish the crimes jointly. The statutes set out separate penalties for each offense and do not direct the manner in which a trial court must sentence for a violation of both. The sentencing clause in each statute provides, in pertinent part:

Sentence.—A sentence imposed under this section may be separate from and consecutive to or concurrent with a sentence for any crime based on the act establishing the violation of this section.

In *Morris*, 192 Md.App. at 39, 993 A.2d 716, we stated that, if the offenses are separate, we look to "whether the 'Legislature intended multiple punishment for conduct arising out of a single act or transaction which violates two or more statutes[.]' " (Citation omitted). Here, the General Assembly has set forth two separate statutes with separate elements of intent and separate punishments. In our view, there is no indication that the General Assembly intended punishment for convictions of both as a single or merged offense.

Appellant's conduct was not predicated on a single act or harm.[13] Although involving the same victim, appellant was

---

13. Appellant spoke with multiple people on different dates about the intent to murder Ennels. Edmonds testified that approximately one month after the October 13, 2006, murder of Brown, appellant spoke to him about "killing Ennels." On October 3, 2007, four days before Ennels's murder, appellant talked to Shropshire about what to do. According to Jalloh, while in custody awaiting trial, appellant told him he was trying to locate the witness and he heard appellant say killing the witness was the only way he could go home. The evidence demonstrated that appellant's intent to murder Ennels formed shortly

charged under two distinct laws prohibiting retaliation for former testimony and preclusion of future testimony. By the murder of Ennels, appellant punished or retaliated against him for testifying before the grand jury. By the murder of Ennels, appellant also achieved the goal of insulating himself from Ennels's anticipated testimony at trial. Although the case involves a single victim, two separate and distinct goals or harms were caused by appellant's conduct, and one offense was not necessarily the overt act of the other. The second offense required separate and distinct intent.

Aside from the rule of lenity, in *Monoker v. State*, 321 Md. 214, 223, 582 A.2d 525 (1990), the Court of Appeals noted that "other considerations may be applicable in arriving at a principled decision." (Citation omitted). The Court stated: "One of the most basic considerations in all our decisions is the principle of fundamental fairness in meting out punishment for a crime." *Id.* (citation omitted). In *Monoker, id.* at 223–24, 582 A.2d 525, where the defendant was charged with both solicitation and conspiracy, the Court of Appeals held that, where "the solicitation was part and parcel of the ultimate conspiracy and thereby an integral component of it, it would be fundamentally unfair to [the defendant] for us to require him to suffer twice[.]"

This case, however, presents a far different situation. As appellant is being sentenced for two offenses, solicitation to retaliate and solicitation to prevent a witness from testifying, involving conduct that occurred over the course of two years, the principles of fundamental fairness are not violated by sentencing separately for both intents, *i.e.* harms. For all of the reasons set forth above, we conclude that the circuit court properly refrained from merging appellant's sentences for solicitation for the purpose of preventing future testimony pursuant to C.L. § 9–302(b) and solicitation for the purpose of retaliation under C.L. § 9–303(b).

---

after the murder of Brown and resulted in Ennels's death approximately two years later.

684

JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.