*Jamaal Garvin Alexis v. State of Maryland*, No. 45, September Term, 2013

**CRIMINAL LAW — SIXTH AMENDMENT — RIGHT TO COUNSEL OF CHOICE — DISQUALIFICATION OF COUNSEL:** Although a criminal defendant is afforded a presumption in favor of his or her counsel of choice under the Sixth Amendment, this right is qualified in many important respects. In deciding whether to disqualify a criminal defendant's selection of counsel due to a conflict of interest, a trial court is afforded wide discretion. In this case, the trial court conducted a hearing on the matter and made evidentiary-based findings that the interests of fairness and maintenance of ethical standards outweighed the defendant's right to counsel of choice due to a conflict of interest arising from the chosen counsel's prior representation of one of the State's material witnesses. Such an exercise of discretion was not so far beyond the fringe of the court's discretionary range as to require reversal.

**CRIMINAL LAW — RULE OF LENITY — SENTENCING MERGER — SOLICITATIONS:** Petitioner was convicted of violating Criminal Law Article § 9-302 (solicitation for the purpose of preventing future testimony) and § 9-303 (solicitation for the purpose of retaliating for prior testimony). Both statutes have a subsection that precludes merging the sentence for that offense with a contemporary other sentence for conviction of "any crime." Thus, because the plain language of the statutes indicates explicitly that the General Assembly did not intend the sentences to merge, the rule of lenity was inapplicable.

**CRIMINAL LAW — "FUNDAMENTAL FAIRNESS" — SENTENCING MERGER — SOLICITATIONS:** Because the plain language of Criminal Law Article §§ 9-302(d) and 9-303(d) indicated that the General Assembly did not intend the sentences to merge with a contemporaneous conviction for any other crime, the principle of "fundamental fairness" that, at times, require merger of sentences in cases where the rule of lenity and the doctrine of merger are inapplicable, does not apply.

IN THE COURT OF APPEALS OF
MARYLAND

No. 45

September Term, 2013

JAMAAL GARVIN ALEXIS

v.

STATE OF MARYLAND

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Cathell, Dale R. (Retired,
          Specially Assigned),

JJ.

Opinion by Harrell, J.

Filed: March 24, 2014

Following a sixteen-day trial (4 – 29 October 2010) of consolidated cases, a jury in the Circuit Court for Prince George's County convicted Petitioner, Jamaal Garvin Alexis ("Alexis"), in the first case (CT08-0504X), of second-degree murder and robbery with a dangerous weapon of Raymond Brown, use of a handgun in the commission of a crime of violence, common law conspiracy to commit theft over $500, and two counts of theft over $500. In the second case (CT09-1040B), the jury convicted Alexis of solicitation to obstruct justice by preventing Bobby Ennels, a purported witness to the murder of Brown in the first case, from testifying at trial in that case, and solicitation to obstruct justice by retaliating against Ennels for his prior testimony before the grand jury in the first case. On 14 December 2010, Alexis was sentenced to a total of one hundred and forty years of incarceration, twenty of which was for the first solicitation conviction and another twenty of which was for the second solicitation conviction.

The cases were consolidated for appeal to the Court of Special Appeals, which affirmed the Circuit Court's judgment. *Alexis v. State*, 209 Md. App. 630, 61 A.3d 104 (2013). We shall affirm as well, holding first that the trial court exercised its discretion properly in disqualifying one of Alexis's defense counsel, who had represented previously a key State's witness in an unrelated and earlier criminal matter (which conflict of interest the witness refused to waive) and, second, that merger is precluded for convictions of the two counts of solicitation where the relevant statutes contained parallel anti-merger provisions.

## I.    PERTINENT FACTS

### A.  The Background[1]

#### 1.  The murder of Raymond Brown and related crimes.

On the morning of 13 October 2006, Danielle Steele Brown and her husband, Raymond Brown, were awakened by the raucous sound of Mr. Brown's car alarm.  From a window of their dwelling in the Largo area of Prince George's County, Ms. Brown observed a tow truck towing away Mr. Brown's car, a black Chrysler 300.  The Browns, in an attempt to locate a sign in the community with the name of the company that occasionally towed cars parked illegally in the area, drove in Ms. Brown's car to the entrance of their community, where they saw the tow truck with the Chrysler attached. According to Ms. Brown's testimony at trial, Mr. Brown got out of the car and, as Mr. Brown approached the tow truck, a man standing next to the truck ran away.  Gunfire came from the driver's side of the tow truck.  Mr. Brown fell to the ground, injured.  The tow truck drove away with the Chrysler.  Mr. Brown was taken to a local hospital where he died as a result of a gunshot wound to his chest.

Later that day, law enforcement officers recovered the Chrysler, which had been abandoned (sans tires and with a broken door window on the driver's side), as well as an abandoned, stolen Snatchman tow truck with a broken door window on the driver's side as well.  Inside the cabin of the tow truck, the officers found a cartridge casing.  When

---

[1] The "facts" we report are those borne out by the State's presentation of the case and apparently believed by the jury.  Alexis disputes much of these "facts." For purposes of the arguments on appeal, however, the details of this dispute do not add value and, thus, are omitted.

the officers "dusted" the vehicles for fingerprints, they were able to "lift" a latent fingerprint belonging to Neiman Marcus Edmonds from the hood of the Chrysler. Corroborating Edmonds's involvement in the events of October 13, approximately six months after the shooting, Ms. Brown identified Edmonds from a photographic array as the man who had been standing next to the tow truck on the night of her deceased husband's shooting and ran.

According to the testimonies of Edmonds and the other State's witnesses at Alexis's trial, Alexis had a history of stealing cars using a Snatchman tow truck[2] for the purpose of stripping the tires off the cars to sell the rims, and then abandoning the car. Some of these witnesses claimed that Alexis admitted to shooting and killing Brown. Edmonds testified that Alexis, Ennels, and he drove to Largo to steal a car in the late evening of 12 October 2006. Alexis drove a stolen Snatchman tow truck. Bobby Ennels drove his car, with Edmonds asleep in the back seat. Alexis backed the tow truck into the Browns' driveway, put the forks under the Chrysler 300 (which had 22-inch rims), and picked it up. When Alexis picked up the Chrysler, the car's alarm sounded. Alexis drove the truck (with the car attached) to the front of the community, where Ennels broke the Chrysler's door window on the driver side and popped the hood so that Edmonds could disable the alarm.

---

[2] Testimony at trial established that, with a Snatchman tow truck, a driver is able to attach to the tow truck (and take) another car by backing the truck up to the car, sliding the forks under the car, and driving the truck away with the car attached. This towing process permits the truck driver to tow the car away without getting out of the truck.

As Edmonds disabled the alarm, another car approached. When a man stepped out of the second car, Edmonds ran to Ennels's car. Edmonds testified that, as he ran to the car, he heard a "slight pow" and glass breaking. Ennels and Edmonds drove to a previously agreed upon meet-up location, where they found Alexis with the tow truck (with a newly broken window) and the Chrysler attached. Edmonds asked Alexis if the man in the second car shot at them; Alexis did not reply. The trio stripped the Chrysler of its tires, "wiped down" the car and the tow truck, and abandoned both vehicles. The next day, according to Edmonds's testimony, Alexis, Edmonds, and Ennels were at the house of Brian Barnes (a mutual acquaintance) when Alexis told Edmonds that he shot Brown (the man in the second car) because he saw Brown get out of the car with something in his hand.

On 27 March 2008, the State charged Petitioner, Jamaal Garvin Alexis, with murder, carjacking, and related crimes with respect to Brown.

### 2. The murder of Bobby Ennels.

Also, according to Edmonds's testimony, Ennels was present at Barnes's house on 14 October 2006 during the conversation in which Alexis admitted to shooting Brown the previous day. According to Edmonds, this conversation led Ennels to "freak[] out," which, in turn, caused Alexis to worry that Ennels might "snitch." Edmonds asserted to Alexis that Ennels would not do that. Approximately one month later, Alexis asked Edmonds if he thought Alexis should kill Ennels if Ennels tried to snitch. Edmonds re-affirmed his confidence in Ennels. Nevertheless, Alexis suggested that Edmonds get

-4-

Ennels drunk one night and in a car, pull up to a stop light, and let Alexis "do the rest." Edmonds refused.

On 3 October 2008, Alexis, while detained at the Prince George's County Detention Center, called Deaundrey Shropshire, who was raised with the Alexis family and was the current roommate of Alexis's brother, Rashadd. Alexis asked him, "What's going on with my M?" Shropshire responded, "You still haven't told me what you want me to do with that [guy]."[3]

Three days later, on 6 October 2008, according to the State's witness, Ms. Frances Lammons, Ennels, Anthony Cash, III, and Lammons drove to a location on Nalley Road in the County. Upon arrival, Ennels called someone and stated, "You all can come on down . . . ." Approximately two minutes later, two men approached the car. Lammons testified that one man was "brown skin[ned with a] short haircut," and the second man was "brown skin[ned] with dreads." According to Lammons, Ennels told the men, "You all don't have to worry about nothing[;] It's okay. It's cool." Whereupon, the man with the short haircut shot Ennels. Upon being shot, Ennels put the car into reverse and crashed into a tree. Lammons and Cash got out of the car and ran. Lammons was shot in the elbow while fleeing.

Ennels was found dead in the driver's seat of the car. Cash was found dead, as a result of gunshot wounds to the back, forearm, and knee, in the driveway of a nearby home at 406 Nalley Road. In a neighboring house at 404 Nalley Road, law enforcement

---

[3] At trial, the State introduced an audiotape of this call.

officers found a black skull cap, which contained a mixed DNA profile. Analysts determined later that Alexis's brother, Rashadd Alexis, was the major contributor to the DNA on the skullcap.

Officer Juan Nolasco testified that, on the morning of the Ennels-Cash murders, around 1:00 AM, he observed two vehicles speeding from the area of Nalley Road where the bodies of Ennels and Cash were found later. The Officer stopped one of the vehicles, a Buick Regal, registered to Shropshire. The driver of the stopped vehicle was Rashadd Alexis, who, according to Officer Nolasco, was very nervous and appeared to have blood on his shirt. Rashadd Alexis was released at that time, pursuant to an order from a detective at the scene of the shooting. Shortly thereafter, while Lammons was in hospital, the Prince George's County Police Department showed her a photographic array. She selected a picture of Barnes as someone who looked familiar to her and as a person that "resembled" a man present at the Nalley Road shootings. Lammons was shown a picture of Rashadd also, but could not identify or recognize him.

As part of the investigation of Cash's and Ennels's murders, law enforcement officers discovered that the last call to Ennels's cellular telephone before his murder was from a telephone number associated with a prepaid telephone purchased in Landover, approximately a mile from Rashadd Alexis's house. Phone records disclosed that only thirteen telephone calls were made from this particular number. All thirteen calls were made to Ennels's cellular telephone between 23 September 2008 and 7 October 2008, the day of Ennels's murder. Additionally, law enforcement officers discovered that the calls

utilized cellular telephone towers located near Swan Terrace, where Rashadd Alexis's and Petitioner's aunt lived and a half mile from where Rashadd's girlfriend lived.

### 3. Jalloh, the jailhouse informant.

Amadu Sulamon Jalloh, an inmate with pending criminal charges, was incarcerated with Jamaal Alexis and Donnell Hunter (a/k/a "Fat Rat") at the Prince George's County Detention Center. Jalloh informed his attorney that he overheard conversations between Alexis and Fat Rat regarding the murder of Brown and the potential killing of a witness. Jalloh's attorney arranged a meeting between Jalloh and an Assistant State's Attorney. According to Jalloh's ultimate grand jury testimony,[4] Alexis confessed to him in jail that he murdered Brown. Moreover, Jalloh stated that, on one occasion, he heard Fat Rat tell Alexis that "the only way you can go home is to kill the witness." Jalloh testified also that, at some point after Jalloh's meeting with the Assistant State's Attorney, Alexis told Jalloh that he was going home because "[his] brother got rid of the witness." According to Jalloh, Alexis told him that three people had been shot: two men were killed and a girl was injured.

On 30 July 2009, the State charged Alexis with the murder of Bobby Ennels, a purported witness to the Raymond Brown murder, as well as with attempted murder, conspiracy to commit murder, solicitation to obstruct justice by preventing Ennels's future testimony, and solicitation to obstruct justice by retailiating against Ennels for his grand jury testimony.

---

[4] When Jalloh refused to testify at trial, the trial judge permitted the State to read his grand jury testimony aloud to the jury.

-7-

**B. Pre-Trial Events Relating to the Disqualification of Alexis's Lead Defense Counsel.**

On 13 October 2006, when Petitioner was charged initially with the first degree murder of Raymond Brown, and related charges, attorney Luis J. Martucci represented Alexis. Subsequent to the indictment on 1 April 2008, an additional attorney, John McKenna, entered an appearance on behalf of Alexis. The case against Alexis was scheduled initially for a motions hearing on 1 July 2008 and for trial on 6 August 2008. After several continuances, Messrs. Martucci and McKenna withdrew the pending motions and the case was set for trial on 9 March 2009. On 18 December 2008, Harry Tun, Esquire, filed a Motion for Substitution of Counsel (replacing Martucci and McKenna), which the Circuit Court granted on 29 December 2008. Tun filed additionally a motion to continue the trial date to 13 April 2009, which the Circuit Court granted as well.

Several months later, on 1 April 2009, the State filed a Motion to Strike the Appearance of Defense Counsel Tun. In their Memorandum of Law in support of their motion, the State explained that Jalloh was a material witness in its case because he agreed to testify about Alexis's confession to murdering Brown and other related conversations. The State sought to strike the appearance of Tun as defense counsel for Alexis because of a conflict of interest arising from Tun's prior representation of Jalloh with respect to charges pending against Jalloh in *State of Maryland v. John Doe, aka Kamara Mohamed*, CT07-2450X, in the Circuit Court (apparently Jalloh was known also as Kamara Mohamed).

To summarize the facts regarding this prior representation, as presented to the Circuit Court at the hearing on the motion to disqualify counsel, Tun's representation of Jalloh against the then still pending charges of attempted murder and associated charges in a matter unrelated to the case against Alexis lasted from 18 December 2007 until 5 February 2008. During that time, according to Tun, he met with Jalloh "at least five times going over [ ] the case that he was involved [in]." As part of Tun's representation of Jalloh, he received from the State discovery in Jalloh's case on 2 January 2008, represented Jalloh at a bond hearing on 18 January 2008, and filed a motion to sever Jalloh's case from that of a co-defendant on 25 January 2008. After Tun's representation of Jalloh was terminated, Jalloh filed a complaint on 19 February 2008 against Tun with the Attorney Grievance Commission of Maryland.

In light of this prior representation, the State moved to strike the appearance of Tun. The State averred that a conflict of interest existed between Tun's representation of Alexis and his prior representation of Jalloh, a State material witness, because "Tun was provided with confidential privileged attorney-client information concerning Mr. Jalloh's background and the facts and circumstances of Mr. Jalloh's case." In support of this assertion, the State attached an affidavit by Jalloh indicating that he provided "confidential information pertaining to [his] case" to Tun. Particularly because the State predicted that Jalloh's credibility would be a "center-point of both the State's examination and the Defense's cross-examination," the State asserted that the conflict of interest would violate the Maryland Lawyers Rules of Professional Conduct, *see* Md. Rules of Professional Conduct 1.7 & 1.8, because Jalloh refused to waive his attorney-

client privilege. Additionally, the State argued that the court should strike defense counsel's appearance because any conviction of Alexis obtained with Tun as Alexis's counsel would be overturned on appeal or during collateral review on the basis of ineffective assistance of counsel if Tun were permitted to continue representing Alexis in view of the conflict of interest with Jalloh.

On 9 April 2009, Tun filed, on behalf of Alexis, a Memorandum of Law in Opposition to the State's motion. Tun acknowledged that he had represented Jalloh, whom he knew at the time as Kamara Mohamed, but argued that the representation was for "a brief and limited period of time," less than two months. Tun stated that, during the representation, he had "focused chiefly on procedural matters" and had not prepared for trial at that time. "[Tun] estimate[d] that he spent less than 20 hours working on Mr. Mohamed's case altogether." Moreover, Tun stated that, when he was retained by Alexis on 18 December 2008, "[he] was unaware that Jalloh had any involvement or personal stake in [] Alexis's matter."

Tun maintained that the Circuit Court should not strike his appearance for several reasons. First, Tun averred that the information that Tun gained about Jalloh during his representation of him was not privileged because it had become known generally to the State (the opposing party) through Jalloh's voluntary divulgements and through Jalloh detailing his case in his complaint filed against Tun with the Attorney Grievance Commission of Maryland. Second, Tun argued that he should not be disqualified because effective safeguards in the trial of Alexis could eliminate any conflicts associated with his prior representation of Jalloh. Specifically, Tun proffered that "the limited

appearance of attorney Antonio Jones for the purpose of cross-examining [ ] Jalloh at trial will create a 'Chinese wall' that will effectively serve to isolate any conflict of interest [ ] Tun's previous limited representation of [ ] Jalloh might have upon the Defendant." Tun believed that "this screen will address any concerns that a conflict of interest in [ ] Tun representing [ ] Alexis while maintaining any privileged communications from [ ] Jalloh" because Tun screened effectively himself from any conflict associated with Jalloh. Lastly, Tun argued that Alexis would suffer less prejudice if he is permitted to retain his current counsel.

Also on 9 April 2009, defense co-counsel, Ross D. Hecht, filed a motion to exclude Jalloh's statements. In that motion, Hecht made several statements indicating that it was his understanding that Jalloh had a history of serving as a jail house snitch:

> It is undersigned counsel's understanding that Mr. Jalloh has cooperated with the State as an informant in several criminal matters in an effort to benefit his own circumstances. . . . It is undersigned counsel's understanding that Mr. Jalloh has been cooperating with the law enforcement for some time. . . . It is submitted that throughout the tenure of Mr. Jalloh's cooperation, Mr. Jalloh has been actively seeking information and trying to gain details from other inmates to help himself. . . . At the time that Mr. Jalloh obtained such information, he was working as a criminal informant for law enforcement in several different criminal cases in an effort to compel the prosecution to pursue a more lenient sentence in his own pending criminal matters.

On 10 April 2009, the Circuit Court held a hearing to address the various motions, including the motion to disqualify defense counsel and the motion to exclude Jalloh's statements. The court stated that it would allow each side a chance to make an opening and "then we'll call witnesses as necessary" on the motions. After hearing the parties' arguments on the motion to disqualify counsel, the hearing judge stated:

THE COURT:  Anything else?

MR. TUN:  No, your Honor.

THE COURT:  All right.  On the State's motion to strike Mr. Tun as attorney for the Defendant, for some reason, I don't know what the statistical likelihood of this happening is, the Defendant in this case and Mr. Tun's former client, Mr. Amadu Jalloh, were placed in the same jail cell at the County Correctional Center and apparently have some conversations which I believe the State intends to use, if I'm not mistaken.

[ASSISTANT STATE'S ATTORNEY]:  Yes, Your Honor.

THE COURT:  While Mr. Alexis has waived whatever conflict Mr. Tun might have, . . . Jalloh . . . has not and, in fact, takes significant exception to Mr. Tun continuing to participate in this case when he [Jalloh], in fact, is going to be a witness for the State.  The conflict is a significant one and I think we all agree there is, in fact, conflict.  There is conflict with the duty of loyalty.  I appreciate Mr. Tun represented him [Jalloh] for a short period of time but, I think, that duty of loyalty continues and, in fact, there is really is truly a conflict were this case to go to trial with Mr. Tun at the table.

To say that we can create a Chinese wall, a masonry wall, a brick or a block wall that solves this problem I think is folly.  I just don't believe that we can do that.  Having said all that, accordingly, I'm going to direct the Clerk to strike Mr. Tun's appearance.

During a recess in the court proceedings, Hecht approached the court in chambers (which was recounted on the record after the recess concluded) to ask whether the court would reconsider its ruling striking Tun's appearance if Tun was not present in the courtroom during any examination of Jalloh.  The Circuit Court replied on the record: "I'm really not inclined to reconsider that ruling.  I just think if I do, I'll be doing this case twice."

-12-

## C. Trial: Jury Instructions, Jury Verdict, & Sentencing.

The cases against Alexis were tried together in a sixteen-day trial in October of 2010. Prior to closing arguments, the Circuit Court instructed the jury as to the solicitation charges as follows:

> The defendant is charged with two separate counts of the crime of Solicitation to Commit Obstruction of Justice. That is preventing witness testimony or retaliation for testimony. A criminal solicitation is an effort to persuade another person to commit a crime. In order to convict the defendant of Solicitation, the State must prove, one, that the defendant urged, advised, induced, encouraged, requested, or commanded another person to commit Obstruction of Justice by Preventing Witness Testimony and/or Obstruction of Justice in Retaliation for Testimony; and two, that at the time the defendant made the oral or written efforts to persuade another person to commit Obstruction of Justice by Preventing Witness Testimony and/or Obstruction of Justice by Retaliation for Testimony, the defendant intended that the Obstruction of Justice Preventing the Witness Testimony and/or Obstruction of Justice for Retaliation for Testimony be committed.
>
> The crime of Solicitation is in the asking. It is not necessary that the Obstruction of Justice Preventing the Witness Testimony and/or Obstruction of Justice Retaliation for Testimony actually be committed.

With respect to the first case, the jury convicted Alexis of second degree murder of Brown, robbery with a dangerous weapon of Brown, use of a handgun in the commission of a crime of violence, conspiracy to commit theft over $500, and two counts of theft over $500. With respect to the second case, the jury convicted Alexis of solicitation of Rashadd Alexis to obstruct justice and murder Ennels to prevent his future testimony and solicitation of Rashadd Alexis to obstruct justice by retaliating against Ennels for his grand jury testimony.

At the sentencing hearing on 14 December 2010, defense counsel argued that Alexis was "found guilty of two offenses which the lesser charge would merge with the

second" and, thus, the solicitation to obstruct justice by retaliation for the testimony of Ennels before the grand jury would merge with the solicitation to obstruct justice by preventing Ennels's testimony at trial. The State responded, arguing that the solicitation sentences should not merge for several reasons. First, the solicitation convictions are two separate offenses (C.L. §§ 9-302 and 9-303) that "refer to two separate aspects. One is retaliation for testifying against the grand jury. The other is an inducement to not testify at trial." Moreover, because "the solicitation is in the asking[,] . . . it has to be asked two separate times, to retaliate and to prevent." Lastly, "they refer to two separate dates; one being March of #08 for the grand jury and the second being the October 2010 eventual trial." The Circuit Court rejected defense counsel's merger argument and sentenced Alexis to two consecutive sentences of twenty years for the solicitation convictions.

The two cases were consolidated on appeal. The Court of Special Appeals affirmed, in *Alexis v. State*, 209 Md. App. 630, 61 A.3d 104 (2013), the Circuit Court's judgment. On 20 June 2013, this Court issued a writ of certiorari, in response to Alexis's petition, to consider the following questions:

(1) Did the trial court err by disqualifying petitioner's attorney, who had previously represented a State's witness, when the witness refused to waive the conflict of interest and appellant's counsel had arranged for co-counsel to cross-examine the witness?

(2) Are consecutive sentences appropriate where petitioner was convicted of two counts of solicitation where both counts were predicated on the same evidence?

## II.    TRIAL COURT'S DISQUALIFICATION OF DEFENSE COUNSEL.

The Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee that, in all criminal prosecutions, the accused has the right to assistance of counsel for his defense.[5]   The Supreme Court recognizes that "this right was designed to assure fairness in the adversary criminal process," *Wheat*, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988) (citing *United States v. Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981)), and that "the purpose of providing assistance of counsel 'is simply to ensure that criminal defendants receive a fair trial.'"  *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984)).   Additionally, included as part of the right to assistance of counsel, is the qualified right of a defendant to select and be represented by one's preferred attorney.  *See Wheat*, 486 U.S. at 159, 108 S.Ct. at 1697, 100 L.Ed.2d 140; *State v. Goldsberry*, 419 Md. 100, 117-18, 18 A.3d 836, 847 (2011); *McCleary v. State*, 122 Md. 394, 400, 89 A. 1100, 1103 (1914).

As the Supreme Court observes, "[i]n evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'" *Id.* (quoting *United States v. Cronic*, 466 U.S. 648, 657, n. 21, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984)).  Thus, "while the right to select and

---

[5] The Sixth Amendment to the United State Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  Similarly, Article 21 of the Maryland Declaration of Rights provides "[t]hat in all criminal prosecutions, every man hath a right . . . to be allowed counsel . . . ."

be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.* (citing *Morris v. Slappy,* 461 U.S. 1, 13–14, 103 S.Ct. 1610, 1617–1618, 75 L.Ed.2d 610 (1983); *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). Accordingly, the right of a defendant to counsel of choice is "circumscribed in several important respects." *Wheat*, 486 U.S. at 159, 108 S.Ct. at 1697, 100 L.E.2d 140. *See also Goldsberry*, 419 Md. at 118, 18 A.3d at 847 ("The right to counsel of choice . . . is qualified."). For example, a defendant may not "insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government." *Id.* The question raised in the present case is the extent to which a defendant's Sixth Amendment right to choice of counsel is qualified by the fact that the chosen attorney has a previous attorney-client relationship with a material witness of the opposing party.

### A. Standard of Review

In multiple cases involving requests for disqualification of counsel due to alleged conflicts of interest, the Supreme Court and this Court applied the abuse of discretion standard of review. *See, e.g.*, *Wheat*, 486 U.S. at 163, 108 S.Ct. at 1699, 100 L.E.2d 140 (stating that "[w]e do not think it can be said that the court exceeded the broad latitude which must be accorded it in making this decision" on the motion for substitution of counsel due to an alleged conflict of interest); *Gatewood*, 388 Md. at 538-40, 880 A.2d at 329-30 (concluding, after review of prior case law, the appropriate standard of review in

such cases is abuse of discretion) (citing *Lykins v. State*, 288 Md. 71, 415 A.2d 1113 (1980); *Young v. State*, 297 Md. 286, 465 A.2d 1149 (1983)).  In *Wheat*, the leading Supreme Court case on the disqualification of counsel due to a conflict of interest, the Court held that "the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses."  *Id.*, 486 U.S. at 163, 108 S.Ct. at 1699.  The Court explained that wide latitude was necessary for the following reasons:

> [A] district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

*Wheat*, 486 U.S. at 162-63, 108 S. Ct. at 1699, 100 L.E.2d 140.[6]

---

[6] Alexis points out that these cases involved conflicts of interest arising from multiple representation (an attorney with a conflict or potential conflict between two or more current clients) and not successive representation (an attorney with a conflict or

(continued…)

In applying the abuse of discretion standard in *Wheat*, the Supreme Court concluded that the trial judge "relied on instinct and judgment based on experience in making its decision" on the motion for substitution of counsel due to alleged conflict of interest and, thus, the decision should be given wide deference. *Wheat*, 486 U.S. at 163, 108 S.Ct. at 1699, 100 L.E.2d 140. *See also Gatewood*, 388 Md. at 540, 880 A.2d at 330 (acknowledging similarly that, in reviewing a circuit court's decision regarding the disqualification of counsel request for alleged conflicts of interest created by past client representation, "the trial judge is in a unique position to 'sense the nuances' of the situation before him or her.") (quoting *Lykins*, 288 Md. at 85, 415 A.2d at 1121). The Supreme Court acknowledged that "[o]ther district courts might have reached differing or opposite conclusions with equal justification," but emphasized "that does not mean that one conclusion was 'right' and the other 'wrong.'" *Id.*, 486 U.S. at 164, 108 S.Ct. at 1700, 100 L.E.2d 140.

Similarly, we apply the abuse of discretion standard of review in this case. Consequently, we pause to review the contours of this standard of review. "Abuse of discretion," although used and applied with great frequency by appellate courts, has been

---

(…continued)

potential conflict with at least one former client), as is present in this case. Alexis suggests in his brief that, because multiple representation and successive representation pose different dangers, different standards may apply. At oral argument, however, Alexis's counsel conceded that the appropriate standard of review was abuse of discretion. Such a concession was proper because, even were we to acknowledge that conflict of interests may pose different dangers depending on the source of the conflict, the reasoning for our wide deference to the trial court's determinations remains applicable regardless of the source of conflict.

-18-

described aptly as a "very general, amorphous term[] . . . ." *North v. North*, 102 Md. App. 1, 648 A.2d 1025 (1994). This perception is due, in large part, to the multitude of definitions for the term and, in some other part, to the necessity for its nature to change according to the legal context at issue.

In regards to the multitude of varying definitions of "abuse of discretion," as we recognized previously, "[o]ne of the more helpful pronouncements on the contours of the abuse of discretion standard comes from Judge . . . Wilner's opinion in *North v. North*, 102 Md. App. 1, 648 A.2d 1025 (1994)," when he was the Chief Judge of the Court of Special Appeals. *King v. State*, 407 Md. 682, 697, 967 A.2d 790, 798 (2009). In *North*, Judge Wilner explained:

> "Abuse of discretion" . . . has been said to occur "where no reasonable person would take the view adopted by the [trial] court," or when the court acts "without reference to any guiding rules or principles." It has also been said to exist when the ruling under consideration "appears to have been made on untenable grounds," when the ruling is "clearly against the logic and effect of facts and inferences before the court," when the ruling is "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result," when the ruling is "violative of fact and logic," or when it constitutes an "untenable judicial act that defies reason and works an injustice."

*North,* 102 Md. App. at 13–14, 648 A.2d at 1031–32 (alterations in original) (emphasis added) (internal citations omitted). Judge Wilner observed that a "certain commonality [exists] in all these definitions": "the notion that **a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling**." *Id.*, 102 Md. App. at 14, 648 A.2d at 1032 (emphasis added). Rather, "[a] court's decision is an abuse of discretion when it is 'well removed

-19-

from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Gray v. State,* 388 Md. 366, 383, 879 A.2d 1064 (2005) (quoting *Dehn v. Edgecombe,* 384 Md. 606, 628, 865 A.2d 603 (2005)) (some internal quotation marks omitted).

As Judge Wilner explained, "That kind of distance can arise in a number of ways." *North*, 102 Md. App. at 14, 648 A.2d at 1032. For example, the circuit court's ruling is "beyond the fringe" if it "either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective." *Id.* Because we give such deference to a trial court's decision under the abuse of discretion standard of review, it is well established that "[t]he exercise of discretion ordinarily will not be disturbed by an appellate court." *Gatewood*, 388 Md. at 540-41, 880 A.2d at 330 (citing *Tierco Maryland, Inc. v. Williams*, 381 Md. 378, 413, 849 A.2d 504, 525 (2004)).

In our cases elaborating on the definition of abuse of discretion, the notion that this term of art "connotes, by definition, some range within which discretion may be legitimately exercised one way or the other without constituting an abuse" is repeated frequently. We must remember:

> The notion of a range of discretion, however, is not an immutable and invariable criterion in all of its myriad applications. The range of discretion frequently changes with the subject matter calling for the exercise of discretion. In handling the progress of a trial, for instance, as where the judge rules on a leading question, permits a continuance, or assesses the need for a mistrial, the range of discretion is very broad and the exercise of discretion will rarely be reversed. On the issue now before us [referring to a trial judge's ruling that the suit was filed within the applicable statute of limitation and that there was no justifiable reason for the delay], by way of contrast, the discretionary range is far more narrow. It is circumscribed by strong policy considerations and well-articulated guidelines.

-20-

*Canterbury Riding Condo. v. Chesapeake Investors, Inc.*, 66 Md. App. 635, 648, 505 A.2d 858, 864 (1986).

In this case, the discretionary range is governed by strong policy considerations that underlie the Sixth Amendment constitutional rights, as well as (potentially) by guidelines articulated recently in *State v. Goldsberry*, 419 Md. 100, 18 A.3d 836 (2011). Thus, we explore now the picket lines of the constitutional right and the applicable guidelines to understand better the limits of the range within which a trial court may act properly.

### B. The Constitutional Right to Counsel

This Court addressed recently in *Goldsberry* what is "require[d] of a trial court in making the important and weighty assessment presented by a choice of counsel issue." We recognized that the baseline considerations for this assessment are founded on the Supreme Court's pronouncement "that the proper balance is struck when 'the district court [ ] recognize[s] a presumption in favor of [the defendant's] counsel of choice,' which 'may be overcome not only by a demonstration of actual conflict but *by a showing of a serious potential for conflict.*'" *Goldsberry*, 419 Md. at 120, 18 A.3d at 848 (emphasis added in *Goldsberry*) (quoting *Wheat*, 486 U.S. at 164, 108 S.Ct. at 1700, 100 L.E.2d 140). *Goldsberry* provided guidance how this "important and weighty assessment" is made:

> [B]efore a trial court is permitted to disqualify a criminal defendant's privately obtained counsel (regardless of whether counsel is the defendant's only attorney or one of several on the defense team), **the court must conduct a hearing on the matter, "scrutinize closely the basis for the**

-21-

> **claim," and make evidence-based findings to determine** . . . whether there is "actual or serious potential for conflict" that overcomes the presumption the defendant has to his or her counsel of choice.

*Goldsberry*, 419 Md. at 123, 18 A.3d at 850 (internal citation omitted) (emphasis added). In other words, "'the trial court cannot vitiate [the right to counsel of choice] without first scrutinizing closely the basis for the claim.'" *Goldsberry*, 419 Md. at 123, 18 A.3d at 850 (alteration in original) (quoting *State v. Peeler,* 828 A.2d 1216, 1225 (Conn. 2003)).

In *Goldsberry*, we required additionally that "[t]he record must reflect that the trial court **contemplated** relevant factors in conducting the test that balances the right to one's counsel of choice against the necessity to uphold 'the ethical standards of the profession' that ensure that 'legal proceedings appear fair to all who observe them.'" *Goldsberry*, 419 Md. at 124, 18 A.3d at 850 (emphasis added) (citing *Wheat,* 486 U.S. at 160, 108 S.Ct. at 1698; *Fuller v. Diesslin,* 868 F.2d 604, 608, 611 (3d Cir.), cert. denied sub nom. *Perretti v. Fuller*, 493 U.S. 873, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989)). The findings should be based on factors such as (1) "the likelihood that defense counsel will have divided loyalties;" (2) "the State's right to a fair trial;" (3) "the appearance of impropriety should the jury learn of the conflict;" and (4) the likelihood that permitting defense counsel's continued representation "will provide grounds for overturning the conviction." *Id.* (quoting *Illinois v. Ortega*, 808 N.E.2d 496, 502 (Ill. 2004)).

Alexis argues that the trial court "did not properly contemplate and apply the relevant factors [as required by *Goldsberry*] when denying [ ] his counsel of choice."[7] According to Alexis, the trial court should have stated on the record its consideration of each of the factors. We do not hold the trial court to such a high standard. It is apt to note that we have announced many times that "'[t]here is no requirement that the trial court's exercise of discretion be detailed for the record, so long as the record reflects that the discretion was in fact exercised.'" *Gray v. State*, 388 Md. 366, 384, 879 A.2d 1064, 1074 (2005) (brackets in *Gray*) (quoting *Williams v. State*, 344 Md. 358, 371, 686 A.2d 1096, 1102–03 (1996)). Thus, so long as the record as a whole reflects expressly or implicitly that the Circuit Court contemplated the relevant factors and reaches a decision that does not constitute an "untenable judicial act that defies reason and works an injustice," *North*, 102 Md. App. at 14, 648 A.2d at 1032, we may conclude that the exercise of discretion is within the proper range.[8]

---

[7] In response, the State argues that this argument is not before this Court properly because Alexis did not raise it in his Petition for Certiorari. Moreover, the State points out that "Alexis does not claim that he raised any of those 'factors' in his trial court pleading[s] or at the hearing on the motion to disqualify." Thus, the State argues, "[t]he trial court should not be faulted for failing to address an argument Alexis did not raise." We do not fault the trial court. Rather, we shall dispose of Alexis's argument.

[8] The State argues additionally that the *Goldsberry* decision is inapplicable to this case. The Court of Special Appeals rejected this argument somewhat summarily in its decision. *See Alexis v. State*, 209 Md. App. 630, 659-60, 61 A.3d 104, 121 (2013) (stating that "[the court] need not explore the *Zenobia* principles to conclude that *Goldsberry* is applicable to the case"). Because we resolve the issue in the State's favor, even assuming that *Goldsberry* applies, we do not address whether the case has a prospective reach to cases pending at the time of its decision.

In the present case, we conclude that the record reflects satisfactorily consideration of these requirements. The trial judge held a hearing on the matter. At the close of the hearing, the trial judge found that all involved parties agreed that "there is, in fact, conflict." He described "[t]he conflict [as] a significant one" and, even though Tun's prior representation of Jalloh was for a short period of time, the "duty of loyalty continues . . . ." Moreover, the trial judge rejected explicitly Tun's proffered "Chinese wall" remedy: "To say that we can create a Chinese wall, a masonry wall, a brick or a block wall that solves this problem I think is folly. I just don't believe that we can do that." Thus, the judge concluded "there is really is [sic] truly a conflict were this case to go to trial with Mr. Tun at the table" and struck Tun's appearance.

The Court of Special Appeals summarized the Circuit Court's findings on this matter as follows: "In sum, the [C]ircuit [C]ourt found that there was a conflict of interest that could not be cured. . . . In the [C]ircuit [C]ourt's view, the risk of conflict outweighed appellant's right to counsel of choice." *Alexis*, 209 Md. App. at 660, 61 A.3d at 121. The intermediate appellate court panel agreed with that determination, *see id.*, and concluded that it was "not persuaded that the circuit court erred or abused its discretion by refusing to accept appellant's waiver of Tun's personal conflict of interest." *Id.*, 209 Md. App. at 661, 61 A.3d at 121.

Without reaching necessarily a determination whether we would have decided the motions as did the Circuit Court, we conclude that such an exercise of discretion was proper; there was no abuse of discretion here. Contrary to Alexis's contention, "a defendant's waiver of the conflict is not always sufficient to cure the conflict." *Alexis*,

209 Md. App. at 661, 61 A.3d at 121.  That the trial judge held a hearing and articulated his reasoning for his ruling indicates that he recognized the severity of the issues at stake and we assume he considered all relevant arguments tendered.  Moreover, the trial judge "was not required to adopt use of co-counsel as a solution where the court perceived that the risk of conflict would persist." *Id.*, 209 Md. App. at 661, 61 A.3d at 121. *See also id.* (citing *United States v. Agosto*, 675 F.2d 965, 974 (8th Cir. 1982), as "explain[ing] why appointment of co-counsel [for the purpose of cross-examination of a witness] is not always a cure-all").  Even if we were to admit that, in light of the weighty and important constitutional right to counsel of choice, the trial judge's decision may be close to the edge of the continuum of the proper exercise of discretion, it is our view that the decision does not venture into the far fringes of impropriety that require reversal.  The Circuit Court's rulings were not violative of fact or logic, or beyond the fringe of what is minimally acceptable, but rather were evidentiary-based as *Goldsberry* requires.

As explained earlier in this opinion, "the trial judge is in a unique position to 'sense the nuances' of the situation before him or her." *Gatewood*, 388 Md. at 540, 880 A.2d at 330 (quoting *Lykins*, 288 Md. at 85, 415 A.2d at 1121).  This statement is true especially in a circuit court's decision regarding the disqualification of counsel for alleged conflicts of interest created by prior representation of a key witness for the State.  As such, we conclude that "[t]he trial court, whose 'finger [is] on the pulse of the trial,' *State v. Hawkins*, 326 Md. 270, 278, 604 A.2d 489, 493 (1992), had a sound basis to decide . . ." that a waiver of the conflict of interest was improper and that the proffered cure was not adequate.  *See Dehn*, 384 Md. at 628-29, 865 A.2d at 616 (holding the trial

-25-

court's evidentiary rulings was not an abuse of discretion). Thus, we affirm the Circuit Court's ruling to strike defense counsel Tun's appearance.

## III.  THE TRIAL COURT'S IMPOSITION OF SEPARATE SENTENCES.

Alexis was charged with and convicted of two counts of solicitation. First, he was charged with and convicted of soliciting his brother Rashadd for the purpose of preventing future testimony, in violation of Maryland Code (2002, 2012 Repl. Vol.), Criminal Law Art., § 9-302(b)(ii). Secondly, Alexis was charged with and convicted of soliciting Rashadd for the purpose of retaliating for prior testimony, in violation of Maryland Code (2002, 2012 Repl. Vol.), Criminal Law Art., § 9-303(b). At sentencing, defense counsel argued that "solicitation to obstruct justice by retaliation for testimony of Bobby Ennels would merge with solicitation to obstruct justice [in the] murder of Bobby Ennels." The trial court rejected Alexis's merger argument, and imposed two 20-year separate and consecutive sentences. The Court of Special Appeals agreed with the trial court, finding that the separate sentences were warranted.[9]

---

[9] It appears that Alexis adds an insufficiency of the evidence question to his appeal before us: "The only remaining question is whether there was factual support for two separate solicitation convictions." Alexis argues that "there is no concrete evidence that the jury could have found two solicitations based on different acts." Specifically, Alexis avers that (1) the jury instruction did not distinguish between the two solicitation counts, and (2) the prosecution never argued that "there were in fact two separate solicitations." We resolve that, to the extent that Alexis raises an insufficiency of the evidence argument, it was not preserved properly for our consideration. Because the proposition raised to and addressed by the trial court was limited to merger of the sentences, and did not address insufficiency of the evidence, we limit our review to Alexis's actual merger argument.

Under Maryland law, the doctrine of merger is examined under three distinct tests: (1) the required evidence test; (2) the rule of lenity; and (3) the principle of fundamental fairness. Petitioner does not argue that merger applies here based on the required evidence test. *See, e.g.*, *Miles v. State*, 349 Md. 215, 227, 707 A.2d 841, 847-48 (1998) ("'When two offenses do not merge under the required evidence test, we have applied as a principle of statutory construction the 'rule of lenity' . . . .'") (quoting *Williams v. State*, 323 Md. 312, 321, 593 A.2d 671, 675 (1991)); *Monoker v. State*, 321 Md. 214, 222, 582 A.2d 525, 529 (1990) (noting that, in cases where two offenses do not merge under the required evidence test, "there are nevertheless times when the offenses will not be punished separately").

### A. Rule of Lenity

The rule of lenity is a common law doctrine that directs courts to construe ambiguous criminal statutes in favor of criminal defendants. In the context of whether two offenses may be punished separately, it is well-understood that "[t]wo crimes created by legislative enactment may not be punished separately if the legislature intended the offenses to be punished by one sentence." *White*, 318 Md. at 744, 569 A.2d 1271. The rule of lenity provides that, "if we are unsure of the legislative intent in punishing offenses as a single merged crime or as distinct offenses, we, in effect, give the defendant the benefit of the doubt and hold that the crimes do merge." *Monoker*, 321 Md. at 222, 582 A.2d at 529 (citations omitted). *See also Miles*, 349 Md. at 227, 707 A.2d at 847 (stating that the rule of lenity "'provides that doubt or ambiguity as to whether the legislature intended that there be multiple punishments for the same act or transaction

-27-

will be resolved against turning a single transaction into multiple offenses.'") (quoting *White*, 318 Md. at 744, 569 A.2d at 1273) (some internal quotation marks omitted). The driving engine behind the rule is "'that the Court will not interpret a . . . criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the legislature] intended.'" *White*, 318 Md. at 744, 569 A.2d at 1273 (quoting *Simpson v. United States*, 435 U.S. 6, 15, 98 S.Ct. 909, 914, 55 L.E.2d 70 (1978)). This statutory construction principle applies, however, only when the statute is ambiguous as to whether the Legislature intended to impose multiple punishments. *Id.*

In evaluating the legality of the imposition of separate sentences from the same act, the Court of Special Appeals explained the proper approach in *Morris v. State*, 192 Md. App. 1, 993 A.2d 716 (2010):

> To evaluate the legality of the imposition of separate sentences for the same act, we look first to whether the charges "arose out of the same act or transaction," then to whether "the crimes charged are the same offense," [*Jones v. State*, 357 Md. 141,] 157, 742 A.2d 493 [(1999)], and then, if the offenses are separate, to whether "the Legislature intended multiple punishment for conduct arising out of a single act or transaction which violates two or more statutes...." *Id.* at 163, 742 A.2d 493.

*Id.*, 192 Md. App. at 39, 993 A.2d at 738.

With regard to the first step of this analysis—whether the charges arose out of the same act or transaction—the *Morris* court explained further:

> The "same act or transaction" inquiry often turns on whether the defendant's conduct was "one single and continuous course of conduct," without a "break in conduct" or "time between the acts." The burden of proving distinct acts or transactions for purposes of separate units of prosecution falls on the State. Accordingly, when the indictment or jury's

-28-

verdict reflects ambiguity as to whether the jury based its convictions on distinct acts, the ambiguity must be resolved in favor of the defendant.

*Id.* (internal citations omitted).   Our intermediate appellate court brethren found in the present case that the conduct underlying the solicitation convictions "was not predicated on a single act or harm":

> Appellant spoke with multiple people on different dates about the intent to murder Ennels. Edmonds testified that approximately one month after the October 13, 2006, murder of Brown, appellant spoke to him about "killing Ennels." On October 3, 2007, four days before Ennels's murder, appellant talked to Shropshire about what to do. According to Jalloh, while in custody awaiting trial, appellant told him he was trying to locate the witness and he heard appellant say killing the witness was the only way he could go home. The evidence demonstrated that appellant's intent to murder Ennels formed shortly after the murder of Brown and resulted in Ennels's death approximately two years later.

*Alexis*, 209 Md. App. at 682 n.13, 61 A.3d at 134 n.13.

We disagree with this characterization of the relevant events.  The evidence at trial indicated that Alexis solicited Edmonds to assist in the murder of Ennels in November of 2006.  The charges in the indictment did not depend on, however, events occurring in 2006.   Specifically, the indictment charged that Alexis solicited "Rashadd . . . and unknown others" for the purpose of retaliating against Ennels for prior testimony and of preventing his future testimony "**between the 21st day of May, two thousand and eight, and the 7th day of October, two thousand and eight**."  (Emphasis added.)

Examining the jury instruction and the jury verdict sheet, it appears that the main distinction between the two solicitation charges and convictions were described solely in terms of the purpose or motivation for the solicitation.  As such, there may be ambiguity as to whether the jury based its convictions on distinct and separate acts, particularly in

light of the fact that the prosecutor did not distinguish separate acts clearly. Thus, because we resolve any ambiguity in favor of the defendant, we proceed here on the assumption that the convictions were based on the same act (even if conducted with multiple objectives).

We look next to whether the crimes charged constitute the same offense. In this case, the crimes charged are two separate offenses: (1) solicitation for the purpose of retaliation for prior testimony under § 9-303; and (2) solicitation for the purpose of preventing future testimony under § 9-302. As the Court of Special Appeals explained:

> Although involving the same victim, appellant was charged under two distinct laws prohibiting retaliation for former testimony and preclusion of future testimony. By the murder of Ennels, appellant punished or retaliated against him for testifying before the grand jury. By the murder of Ennels, appellant also achieved the goal of insulating himself from Ennels's anticipated testimony at trial. Although the case involves a single victim, two separate and distinct goals or harms were caused by appellant's conduct, and one offense was not necessarily the overt act of the other. The second offense required separate and distinct intent.

*Alexis*, 209 Md. App. at 682-83, 61 A.3d at 134. We agree.

To resolve the sole remaining question—whether the Legislature intended multiple punishments for conduct arising out of a single act or transaction which violates two or more statutes—we embark on an exercise in statutory analysis. Each solicitation statute contains the following identical sentencing clause:

> Sentence.—A sentence imposed under this section may be separate from and consecutive to or concurrent with a sentence for **any crime** based on the act establishing the violation of this section.

C.L. § 9-302(d); § 9-303(d) (emphasis added). The plain language of these subsections indicates that the General Assembly intended punishment for convictions under either

-30-

statute **not to merge with a conviction for any other offense**, including a conviction under the other statute. Moreover, the legislative history of this subsection does not indicate to the contrary of the plain meaning of these provisions.

Alexis argues that, even though the plain language states "any crime" and the legislative histories of these statutes do not indicate an intent to the contrary, that we should adopt the legislative intent from other statutes that contain language nearly identical to subsection (d) in §§ 9-302 and 9-303. For example, in *Fisher v. State*, 367 Md. 218, 786 A.2d 706 (2001), we analyzed the legislative history of § 35C(b)(3), the sentencing clause of the statute criminalizing child abuse at that time. This subsection provided, as of 25 June 1997:

> The sentence imposed under this section may be imposed separate from and consecutive to or concurrent with a sentence for any offense based upon the act or acts establishing the abuse.

Md. Code (1957, 1996 Repl. Vol.), Art. 27, § 35C(b)(3). In *Fisher*, we summarized the legislative history on this subsection as follows:

> What is now § 35C(b)(3) was enacted by Chapter 604 of the Acts of 1990 for the express purpose of overruling the holdings in *Nightingale v. State,* 312 Md. 699, 542 A.2d 373 (1988), and in *White v. State,* 318 Md. 740, 569 A.2d 1271 (1990), which had applied the rule of lenity to multiple sentences in child abuse cases. In *Nightingale,* this Court treated a conviction of second degree sexual offense under § 464A(a)(3) as a lesser included offense of sexual child abuse, and we struck the additional sentence that had been imposed by the trial court for the sexual offense violation. In *White,* consecutive sentences had been imposed for murder in the first degree and for child abuse. Applying the rule of lenity we merged the child abuse conviction into the murder conviction.
>
> The purpose clause of Chapter 604 of the Acts of 1990 declares that the Legislature intended to allow the imposition of multiple sentences "if a conviction is entered against an individual for murder, rape, sexual offense,

any sex crime, or any crime of physical violence, and a conviction is also entered for child abuse." The philosophy underlying present § 35C(b)(3) is articulated in a letter from an Assistant Attorney General to the Chairman of the House Judiciary Committee urging adoption of the bill that enacted § 35C(b)(3). In part the letter reads:

> "**Child abuse and the underlying crimes involve separate societal evils.** The underlying crime is one of violence against a member of society. Child abuse is a breach of custodial or familial trust. The two crimes should be punished separately and the person who violates both laws should be exposed to a greater possible penalty."

*Fisher*, 367 Md. at 242-43, 786 A.2d at 720-21.

According to Alexis, grafting this legislative history onto the solicitation statutes' sentencing clauses, it is apparent that the clauses were intended as anti-merger provisions, but only for the narrow purpose of the underlying crime that is solicited by the defendant. In support of his assertion, Alexis points-out that the language in the sentencing clauses of the solicitation statutes is found only in statutes for criminal offenses typically interrelated with other criminal offenses. *See, e.g.*, Md. Code, Crim. Law Art. § 3-601(e) (child abuse and any crime); § 4-204(b)(1)(i) (use of a handgun and a felony or crime of violence); § 5-613(d) (use of a weapon in drug trafficking crime and the drug trafficking crime); § 5-627(d) (distribution of a controlled dangerous substance near a school and distribution of the controlled dangerous substance).

We do not find Alexis's argument so persuasive as to cloak in ambiguity the meaning of the solicitation statutes. The plain language of these anti-merger provisions is clear: "A sentence imposed under this section may be separate from and consecutive to or concurrent with a sentence for **any crime** based on the act establishing the violation of this section." C.L. § 9-302(d); § 9-303(d) (emphasis added). If the Legislature intended

-32-

that the anti-merger provision be limited narrowly to the underlying crime, the Legislature would have stated so. Accordingly, abiding by the direction of the Legislature in this case, we conclude that the sentences should not merge under the rule of lenity.

### B. Merger Under the Principle of Fundamental Fairness

Even where two offenses do not merge under the rule of lenity, this Court has "looked to other considerations in deciding whether two offenses, when based on the same conduct, should be deemed the same." *Williams v. State*, 323 Md. 312, 321, 593 A.2d 671, 675 (1991). In *Monoker*, we explained that "[o]ne of the most basic considerations in all our decisions is the principle of fundamental fairness in meting out punishment for a crime." *Monoker*, 321 Md. at 223, 582 A.2d at 529 (citing *White*, 318 Md. at 746, 569 A.2d 1271; *Whack v. State*, 288 Md. at 142, 416 A.2d 265; *Brooks v. State*, 284 Md. 416, 423, 397 A.2d 596 (1979); *Cousins v. State*, 277 Md. 383, 397, 354 A.2d 825). The *Monoker* Court concluded first that the common law doctrine of merger was inapplicable. Additionally, the Court found that the rule of lenity was inapplicable because the rule applies only to statutory offenses and the two offenses at issue in that case were common law offenses. Despite the inapplicability of these two doctrines, the Court held that the sentences should merge on the basis of "fundamental fairness":

> While solicitation and conspiracy do not merge under the required evidence test, we find it unfair to uphold convictions and sentences for both crimes. Although solicitation is not always a lesser included offense of conspiracy, in Monoker's case the conspiracy to burglarize the Dubin home certainly did ripen from the solicitation of Almony to commit that same crime. *See White v. State,* 318 Md. at 748, 569 A.2d 1271 (statutory offense of child abuse does not merge into common law crime of murder under strict

application of the required evidence test, but the offenses still merge because the abuse and subsequent death of the child are so closely connected as to constitute an integral part of the homicide; the child abuse offense is therefore very much like a traditional included offense of murder). Similarly, here, we conclude that because the solicitation was part and parcel of the ultimate conspiracy and thereby an integral component of it, it would be fundamentally unfair to Monoker for us to require him to suffer twice, once for the greater crime and once for a lesser included offense of that crime. For that reason his sentences should merge.

*Monoker*, 321 Md. at 223-24, 582 A.2d at 529.

In this case, Alexis argues that *Monoker* should control because the principles of fairness require that his solicitation sentences merge. We disagree. In *Monoker*, there was no evidence that the Legislature (or the common law) intended for Monoker to suffer twice for his crimes. As such, if the crimes were statutory offenses, rather than common law offenses as they were at that time, the rule of lenity would have applied. In contrast, in the solicitation statutes at issue in the present case, the plain language of the sentencing clauses of the statutes indicate that the Legislature intended to preclude merger of sentences for a person convicted of violating either solicitation prohibition, as well as of another crime (which could include violating the other solicitation statute). Thus, although we acknowledge the spirit of fundamental fairness, we do not believe it should rule the day here where the clear and plain language of the relevant statutes indicates that merger is precluded.

We hold that the Circuit Court imposed properly separate sentences for the conviction of solicitation for the purpose of preventing future testimony (C.L. § 9-302) and the conviction of solicitation for the purpose of retaliation (C.L. § 9-303).

-34-

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**